UNITED STATES of America,
Plaintiff–Appellee,

v.

Daniel A. WHITE and Judith A. White,
Defendants–Appellants.

No. 91–3429.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 27, 1992.

Decided Aug. 3, 1992.

Deborah J. Daniels, U.S. Atty. (argued), Office of the U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Richard Kammen (argued), McClure, McClure & Kammen and Zoe U. Weiss,

Indianapolis, Ind., for defendants-appellants.

Before COFFEY and MANION, Circuit Judges, and SHABAZ, District Judge.[*]

MANION, Circuit Judge.

On April 19, 1988, a jury convicted Daniel A. White and his wife, Judith A. White,[1] of one count of bankruptcy fraud under 18 U.S.C. § 152 for concealment of various assets in their 1984 bankruptcy filing. After the district court entered judgment, Daniel and Judith appealed to this court. Among other things, Daniel and Judith argued that the government had procured a breach of their attorney-client privilege by obtaining information from their former bankruptcy attorney, Mark Center. Even if none of Center's information was introduced into evidence, Daniel and Judith claimed that it may have provided leads to evidence that the prosecution did use and that the breach therefore implicated their Fifth and Sixth Amendment rights. Finding potential merit in this claim, this court remanded the case to the district court on September 7, 1989 in an unpublished order with the following instructions:

> We do not want to decide a constitutional issue unless we have to, and we may not have to, since the government may have made no use of privileged documents in this case. We would prefer to resolve the issue on a full record. To resolve the threshold factual questions the case must be remanded for appropriate proceedings in the district court to determine, first, whether the government procured or was otherwise, complicit in a violation of the attorney-client privilege and, second, if so, whether the violation resulted in the introduction of evidence sufficiently material and adverse to [the] White[s] that the failure to exclude it denied [them their] basic procedural rights.

*United States v. White*, Nos. 88–2065 and 88–2066, unpublished order at 4–5 (Sept. 7, 1989) [886 F.2d 1318 (table) ] (quoting *United States v. Judith E. White and Richard L. White*, 879 F.2d 1509, 1514 (7th Cir. 1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1471, 108 L.Ed.2d 609 (1990) (*Richard White I*)). On remand, the district court held an evidentiary hearing on the attorney-client privilege issue and also considered Daniel and Judith's argument that the government failed to reveal exculpatory information requested pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court determined that there was no violation of the attorney-client privilege, that even if there was a violation, the government had not procured it, and that the government did not withhold any materials to which the defendants were entitled under *Brady*. Daniel and Judith appeal the district court's determination. We affirm.

### I. Facts

Daniel was a principal shareholder in White Petroleum, Inc. ("White Petroleum"), a corporation that declared bankruptcy in 1983. On June 11, 1984, after the conclusion of the corporate bankruptcy, Daniel and Judith filed a joint Chapter 7 Bankruptcy Petition. Mark Center, a partner at the law firm of Bamberger & Feibleman, represented Daniel, his brothers and their wives in their bankruptcies and was assisted by Nancy Dison, a paralegal.

In October 1985, the Federal Bureau of Investigation (FBI) began investigating the White brothers and their wives as part of an investigation of potential criminal activity by White Petroleum. In the spring of 1987, the FBI agent assigned to the case, Special Agent Michael V. Guio, informed Royal B. Martin, an attorney for Daniel and Judith, that a criminal investigation was in progress and that the government sought certain records belonging to Daniel and Judith. Martin advised the FBI that Daniel and Judith would not voluntarily assist in the government's investigation.

---

[*] Hon. John C. Shabaz, District Judge for the Western District of Wisconsin, is sitting by designation.

1. We make reference to some of Daniel White's brothers in this opinion. To avoid confusion, we will use first names unless we are referring to all the Whites collectively.

Meanwhile, Center was indicted in the Southern District of Indiana on charges of bankruptcy fraud involving Foxcliff, Inc. ("Foxcliff"), a corporation unrelated to White Petroleum. Following a bench trial, Center was convicted in March 1987. In April 1987, Center's partnership with Bamberger & Feibleman terminated.

Following Center's conviction but prior to his sentencing, the United States Attorney for the Southern District of Indiana, John Tinder, contacted Forrest Bowman, Jr., who was representing Center in the criminal proceedings. Tinder inquired whether Center would be interested in cooperating in the White investigation and whether Center wished to add anything regarding the Foxcliff matter now that he had been convicted of criminal conduct. After receiving permission from Center, Bowman met with Tinder, Guio and others on April 1, 1987 and compiled a list of specific information that the government wanted. Guio was interested in determining whether Center was complicit in the Whites' fraud or was a victim of the Whites. With regard to Daniel and Judith White, Guio wanted to know whether Center had inadvertently failed to schedule some of the Daniel and Judith's assets.

Bowman testified before the district court that, at the time that Tinder approached him, Bowman thought that Center was being set up to take responsibility for the criminality of the White brothers and their wives. Therefore, Bowman thought it was important for Center to demonstrate his lack of culpability with regard to anything the Whites did by disclosing whatever information he had to exculpate himself and to help identify those who were culpable. However, Bowman testified that he had no reason to think that Center's cooperation would affect Center's sentence for his recent conviction because Center provided no further information on the Foxcliff matter. Furthermore, Center's sentencing was scheduled to occur soon after Center agreed to assist the government, and, as Bowman put it, "[t]hese things don't get squared away all that quickly." (Tr. II at 145).

Bowman met with Center to discuss the government's request. He learned from Center that shortly after Richard White's discharge in bankruptcy, Nancy Dison had prepared a release of mortgage for Richard and notarized it in blank. The document, which appeared to be prepared by Center, purported to release Richard from his obligation to repay a mortgage allegedly held by Ray Hart, a private individual. Center told Bowman that when he found the falsely prepared release, he had contacted Richard and instructed him not to use the improperly notarized release of mortgage. This information from Center supported Bowman's theory that Dison would commit criminal acts on behalf of Richard and strengthened his belief that Dison and the Whites could be setting Center up.

On April 17, 1987, Bowman met with Tinder, Jackie M. Bennett (an Assistant United States Attorney) other Assistant United States Attorneys, Guio and Special Agent Dimitri Friedrich (Guio's assistant) to discuss Center's responses. Bowman answered general questions regarding the White Petroleum bankruptcy, including questions about Center's use of forms and schedules and Center's reliance on Nancy Dison. Bennett's notes from that meeting indicate that the attorney-client privilege was discussed. According to those notes, Bowman indicated to Bennett: "If we get a waiver or court order, Mark Center will testify." No waiver was ever requested from Daniel or Judith. No waiver was ever offered. No court order was ever issued.

On April 30, 1987, Center was sentenced to one year in prison on the Foxcliff conviction, but was ordered to serve four months. While the remainder of the sentence was suspended, Center was supposed to remain on probation for its duration.

On September 8 or 9, 1987, the government met with Bowman and gave him three typewritten pages of questions regarding the Whites' personal bankruptcies. By this time, Guio and Friedrich had collected documents necessary to submit the case to the Grand Jury and had identified the assets that had not been listed in Dan-

iel and Judith's bankruptcy petition. However, based on Center's responses to the questions that Guio compiled, the government sought to determine whether Daniel and Judith had disclosed to Center or Dison information about those assets that did not appear on their bankruptcy schedules. The assets not included in the bankruptcy petition included checks drawn on Judith's Eli Lilly Company employee savings plan; a parcel of land in Florida that Daniel had purchased on land contract; Daniel's various life insurance policies on himself and his children; and an account receivable owed to Daniel by R.H. Hunning and the Vita Chlor Corporation. On September 10, Bowman, Center and Bennett met again. Bennett's handwritten notes from that meeting include an entry that reads: "Re disclosure, nobody disclosed *anything* to M.C. that wasn't on schedule."

The district court found that Bennett's meeting notes reflected that the government discussed the issue of attorney-client privilege with Bowman. From Bennett's notes, the district court concluded that Bowman had offered a tri-part analysis on the attorney-client question: First, disclosure from a client to an attorney of specific information intended to be transmitted to third parties was not privileged. Second, failure to disclose information upon being asked was possibly privileged. Third, false information given to an attorney was not privileged.

The district court found that in the course of the September meetings, someone indicated a desire to see additional information drafts or schedules pertaining to Daniel and Judith's personal bankruptcy that had been completed by Center or under Center's supervision. Bennett's notes from the first September meeting stated that "M.C. will seek actual files from B & F." Although there was some dispute as to whether someone suggested that Center return to Bamberger & Feibleman to look at his files on the White bankruptcy, the district court found that Center sought to review his files to refresh his memory and, more particularly, to cooperate in answering the government's questions. Bowman stated that when Center said he was going

to review the files, Bowman suggested that Center obtain a copy of the release of mortgage that Nancy Dison had prepared for Richard White.

On September 21 or 22, 1987, during business hours, Center went to Bamberger & Feibleman to review Daniel and Judith's files and to obtain a copy of the blank release of mortgage. Center talked to one of the partners at the firm and assured him that Center would recognize the privilege to the extent that it applied to the information in the files. Furthermore, Center reported that he had consulted with Bowman regarding the privilege. Center then selected a number of documents related to the preparation or filing of the bankruptcy schedules and had a firm employee copy them. He then turned the copies of the documents over to Bowman for review. At Bowman's request, Center reviewed the documents to ensure that the information was of the type that would be disclosed in preparation for bankruptcy proceedings and to ascertain the nature of any other information that the documents contained. Then, Bowman himself reviewed the documents and determined that the documents contained no privileged information.

Bowman and Center then delivered the documents to Bennett. Bennett testified that he was surprised to receive the documents. Bowman explained to Bennett that he had reviewed the documents and concluded that they contained no privileged information. Bennett testified that he independently reviewed the documents and reached the same conclusion.

On September 24 and October 22, 1987, Center appeared before the Grand Jury. He testified about office procedures for handling bankruptcies and specifically about the procedures in Daniel and Judith's bankruptcy. Dison also appeared before the Grand Jury and authenticated the documents written in her handwriting. On November 20, 1987, the Grand Jury returned a one-count indictment against Daniel and Judith charging that they had failed to disclose various assets in their bankruptcy petition. A jury subsequently convicted Daniel and Judith, and the district court

entered judgment on May 25, 1988. Daniel and Judith appeal.

On August 15, 1988, after unsuccessfully appealing his conviction, Center filed a Rule 35 motion requesting a sentence modification. The government responded that although it thought the sentence was appropriate, it had no objection to Center serving some portion of his sentence in a halfway-house. Considering the assistance that Center had rendered to the government in its investigations, the court modified the sentence to allow Center to serve the required four months of incarceration in a community treatment or work release center.

On September 7, 1989, this court remanded Judith and Daniel's case to the district court on the attorney-client privilege issue. The district court held an evidentiary hearing in March 1991 and entered its order on October 8, 1991 finding no violation of the attorney-client privilege and no government misconduct. Daniel and Judith appeal from that order.

The defendants raised five points before the district court on remand and now raise them again on appeal. First, they argue that their non-disclosure constituted a communication protected by the attorney-client privilege. Second, they maintain that the third party disclosure exception to the attorney-client privilege does not apply to the information imparted to an attorney for the preparation of bankruptcy schedules. Third, they insist that the government "aided, encouraged, and was otherwise complicit in assuring Center's breach of [their] privilege." Fourth, they contend that the privileged information that Center provided to the government substantially prejudiced them. Fifth, they maintain that the district court erred in concluding that the government did not withhold exculpatory material from the defendants.

## II. Analysis

Based on the documents and other evidence in the record, we conclude that Daniel and Judith's attorney-client privilege was not violated. We further conclude that even if a violation occurred, the government was not complicit in that violation. Alternatively, we conclude that any violation that occurred would not warrant reversal of Daniel and Judith's conviction.[2] We also agree with the district court that the government did not violate its duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

### A. Attorney–Client Privilege

We note at the outset, that this is not a case in which the defendants' sixth amendment right to counsel is at issue. Center was not representing Daniel and Judith in any criminal matter at the time that the government approached him. Therefore, the cases in which a government agent or informer interfered with the defendant's relationship with his criminal defense attorney are inapplicable here. *Cf. Richard White I,* 879 F.2d at 1513 (Discussions with Center regarding Richard and Judith E. White could not have violated the defendants' sixth amendment right since Center was not representing the defendants in a criminal matter); *United States v. Rogers,* 751 F.2d 1074, 1077–1078 (9th Cir.1985) (seeking information from former tax counsel did not implicate sixth amendment rights of a criminal defendant). Instead, this case presents government attorneys and investigators talking to the former attorney of several suspects. The question is not whether Daniel's and Judith's sixth amendment rights have been violated, but whether their former attorney violated his ethical obligation, whether the government was complicit in that violation, and, if the government's conduct was improper, whether Daniel and Judith have been preju-

---

**2.** With regard to the attorney-client privilege, Daniel and Judith present facts and raise issues virtually identical to those this court addressed in *United States v. White,* 950 F.2d 426 (7th Cir.1991) (*Richard White II*), which involved Richard L. White, Daniel's brother, who was also represented by Mark Center in his bankruptcy. In concluding that the government was not complicit in any violation of Daniel and Judith's attorney-client privilege, we will rely heavily on Judge Kanne's well-reasoned opinion which concluded that the government was not complicit in any violation of Richard White's attorney-client privilege.

diced so that we must reverse their convictions. *Cf. Richard White I,* 879 F.2d at 1513; *Rogers,* 751 F.2d at 1077.

■ Daniel and Judith claim that Center violated their attorney-client privilege both when he told the government about the Whites' non-disclosure of assets and when he turned over notes and other documents used in the preparation of Daniel and Judith's bankruptcy petition. We disagree.

■ This court has long-embraced the general principles of the attorney-client privilege as outlined by Wigmore:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983) (citing 8 Wigmore § 2292). Once the attorney-client privilege attaches to a communication, the communication retains the protection of the privilege even after the termination of the attorney-client relationship. *E.g. United States v. Kleifgen,* 557 F.2d 1293, 1297 (9th Cir.1977). While a violation of the attorney-client privilege is a serious matter, the privilege is in derogation of the search for truth, *Matter of Walsh,* 623 F.2d 489, 493 (7th Cir.1980), *cert. denied,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980) and this circuit has repeatedly held that it must be strictly confined. *United States v. Weger,* 709 F.2d 1151, 1154 (7th Cir.1983) (citation and internal quotations omitted); *Lawless,* 709 F.2d at 487. Furthermore, the privilege must be made and sustained on a document-by-document basis. A blanket claim of privilege that does not specify what information is protected will not suffice. *Richard White II,* 950 F.2d at 430.

Not all information transmitted to an attorney becomes cloaked with the attorney-client privilege. In *Lawless,* an attorney raised the attorney-client privilege to resist a summons to testify regarding books, papers, records and other documents related to the preparation or audit of a tax return that the government was investigating. *Lawless,* 709 F.2d at 486. This court concluded that "[w]hen information is transmitted to an attorney with the intent that the information will be transmitted to a third party ..., such information is not confidential." *Id.* at 487. Although some of the information conveyed to the attorney apparently did not actually appear on the return, this court determined that "[i]f the client transmitted the information so that it might be used on the tax return, such a transmission destroys any expectation of confidentiality which might have otherwise existed." *Id.* Similarly, we concluded in *Richard White II* that "[w]hen information is disclosed for the purpose of assembly into a bankruptcy petition and supporting schedules, there is no intent for the information to be held in confidence because the information is to be disclosed on documents publicly filed with the bankruptcy court." *Richard White II,* 950 F.2d at 430. Since Richard White did not specify any information in the documents given to the Grand Jury or any information in Center's testimony in which Richard had an expectation of confidentiality, *Richard White II* held that Richard had not carried his burden of proving that the attorney-client privilege attached. *Id.* at 430–31.

■ We reach the same conclusion in this case. Daniel and Judith contend that our holding in *Richard White II* should not apply because that holding presupposes that the client disclosed the information in order to assemble a bankruptcy petition but that "[h]ere, there is no evidence that that is the primary purpose for which [Daniel and Judith] consulted Center." (Reply Brief at 5). They maintain that they consulted with Center primarily to determine if bankruptcy was even necessary. The district court, however, concluded that Daniel and Judith intended the information contained in the documents to be transmitted to third parties. We will not overturn the district court's findings of fact unless they are clearly erroneous. *Richard White II,* 950 F.2d at 430. Furthermore, even if Daniel and Judith consulted Center

to determine whether they needed to file for bankruptcy, they have not specified what information the documents contained that they did not intend to be transmitted to third parties. Instead, they continue to assert a blanket privilege. Accordingly, we conclude that Daniel and Judith have not met their burden of showing that the attorney-client privilege attached to the documents Center provided to the government.

■ Aside from claiming a privilege attached to the documents, Daniel and Judith assert that "[t]he fact that a non-disclosure has occurred is information which an attorney is duty-bound to protect for the information is encompassed in the attorney-client privilege." (Whites' Brief at 17). While there may be circumstances where silence or even non-disclosure may be a "communication" (*see United States v. Andrus*, 775 F.2d 825, 852 (7th Cir.1985) (discussing silence as a statement)) protected by the attorney-client privilege, we need not reach the question in the context of this case. The attorney-client privilege · does not protect all communications between an attorney and his client. Rather, it shields from disclosure only communications made for the purpose of obtaining legal advice. *E.g. Lawless*, 709 F.2d at 487; *Weger*, 709 F.2d at 1154; *Walsh*, 623 F.2d at 494.

Even if the Whites' non-disclosure of assets constitutes a "communication," [3] the district court concluded that "there is no evidence that the Whites were seeking legal advice from Center when they decided not to reveal the [assets]." Mem.Op. at 11.[4] Accordingly, the attorney-client privilege did not attach to Daniel and Judith's non-disclosure.

■ Even if Center did disclose information · protected by the attorney-client privilege either by his statements to the government or through the documents he provided, the government did not induce that violation. As the district court noted, the government did not explicitly or implicitly guarantee Center leniency for information. While Center may have hoped his cooperation would impact his sentence, the Whites offer no more than speculation that the government procured a violation of the attorney-client privilege by dangling the carrot of· lenient treatment in front of Center. Furthermore, there is no evidence that the government asked Center to obtain copies of any privileged documents from Bamberger & Feibleman. *Cf. Richard White II*, 950 F.2d at 431 (same finding). In the absence of government complicity, the convictions must stand even if Center violated the attorney-client privilege.

---

**3.** In Richard White's case, the district court concluded that Mark Center's disclosure of a non-disclosure by the Whites' was not disclosure of a communication but disclosure of a " 'lack of communication.' " *Richard White II*, 950 F.2d at 430 n. 2 (7th Cir.1991). Similarly, in Daniel and Judith's case, the district court concluded that "[t]he Whites' nondisclosures on their petitions in this matter did not amount to 'communication' that is protected by the privilege." Mem.Op. at 10. We need not reach this question.

**4.** To support their position, the Whites cite *United States v. Marable*, 574 F.2d 224 (5th Cir. 1978). In *Marable*, Marable and Jones (the two defendants on trial) wished to impeach the testimony of their co-conspirator, Cole, who had testified against them, by calling Cole's former attorney to the stand. According to Marable's proffer, the attorney would have testified that Cole never mentioned Marable's name to him. Jones claimed that the attorney would have testified that Cole admitted that the heroin belonged to him and that Jones had no knowledge

of any heroin deal. The district court excluded the testimony on the basis of the attorney-client privilege. The Fifth Circuit rejected the defendants' arguments. without analysis stating only: "We need not linger long over this point. *See, In re Grand Jury Proceedings v. Jones*, 5 Cir. 1975, 517 F.2d 666, 670; *Laughner v. United States*, 5 Cir.1967, 373 F.2d 326; 8 Wigmore, Evidence, § 2327 (McNaughton rev. 1961)." *Marable*, 574 F.2d at 231. The cases cited pertain to waiver of privilege or inapplicability of the privilege, and the section from Wigmore's treatise addresses waiver. In *Marable*, defendant Jones was clearly asking for an attorney to disclose communications that a client made for the purpose of obtaining legal advice. Marable, however, wanted the attorney to testify about non-disclosures, and his argument, which the Fifth Circuit rejected, appears analogous to the government's argument in this case. However, the Fifth Circuit provided no analysis to explain why the non-disclosure may have been a protected communication. *Marable* thus provides insufficient authority for Daniel and Judith's argument.

▪ Alternatively, assuming the government was complicit in a violation of the attorney-client privilege, we still would not reverse the convictions because Daniel and Judith have not shown any prejudice resulting from the alleged violation.[5] The attorney-client privilege is a testimonial privilege. Consequently, so long as no evidence stemming from the breach of the privilege is introduced at trial, no prejudice results. *See Rogers*, 751 F.2d at 1079 (since the privilege is a testimonial privilege without constitutional footing, a government induced breach of the privilege does not warrant dismissal of an indictment). We speculated in *Richard White I* that if the government, having hold over an attorney, extracts client secrets from him and then uses them in a criminal trial to the client's substantial prejudice, "this *might* be the kind of serious governmental misconduct that would violate a criminal defendant's rights under the due process clause of the Fifth Amendment." 879 F.2d at 1513. However, we need not determine whether due process is implicated in this case because the Whites have failed to show that any violation resulted in the introduction of evidence at trial.

Any misconduct by the government and any resulting prejudice was limited strictly to the investigatory period preceding the trial. The record indicates that the government solicited Center's cooperation to confirm the information it already had compiled concerning the assets missing from the bankruptcy schedules and to insure that Daniel and Judith could not assert that it was Center's decision to omit the assets. Daniel and Judith called Center as a witness at trial, but Center did not testify for the government. Furthermore, the government did not introduce at trial any of the documents that Center provided to Bennett. Finally, there is no evidence that Center's information led to further evidence that the government introduced at trial. Although the information that Cen-

ter provided reassured the government that Daniel and Judith could not point the finger at their attorney and encouraged the government to seek an indictment, that does not justify reversing Daniel or Judith's conviction. "There is a fundamental difference between the use of privileged information at trial, and its use during the investigatory period." *Rogers*, 751 F.2d at 1079. Since the evidence that the government introduced to convict the Whites did not stem directly or indirectly from any information that Center provided, Daniel and Judith suffered no prejudice at trial from any possible breach of the attorney-client privilege. *Cf. id.* at 1079–80 (Prejudice from a breach of a testimonial privilege in the investigatory stage does not warrant dismissal of an indictment. The proper remedy would be exclusion of derivative evidence at trial.).

### B. Brady Material

▪ Daniel and Judith contend that the government violated its duty to reveal exculpatory information requested pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1967). Copies of the notes made during interviews prior to the bankruptcy schedule preparation which Center provided to the government contained references to Florida real estate and an Eli Lilly profit fund and insurance policies. These documents are exculpatory, according to Daniel and Judith, because they indicate that Daniel and Judith did reveal to Center the assets missing from their bankruptcy schedule. The government maintains that the notes are not exculpatory because they refer to *Philip* White's real estate, not Daniel White's, and they refer to an Eli Lilly *pension plan* and *insurance policies*, not two *checks* from an Eli Lilly *savings* plan as referred to in the indictment. Alternatively, the government argues, even if the notes are exculpatory, the government had no duty under *Brady* to turn the notes over to Daniel and Judith

---

5. The district court concluded that the question of the prejudice caused by any violation of Daniel and Judith's attorney-client privilege was moot since there was no government procured violation of the attorney-client privilege. Mem.

Op. at 12. While we find no error in this conclusion, we offer an alternative reason for rejecting Daniel and Judith's attorney-client privilege argument.

because they had access to the bankruptcy files from which Center obtained the notes that he photocopied. Without deciding whether the cryptic notes are exculpatory, we agree with the government's alternative argument.

Under *Brady,* "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. To make a successful *Brady* claim, a defendant must establish the following: "(1) that the prosecutor suppressed evidence; (2) that such evidence was favorable to the defense; and (3) that the suppressed evidence was material." *United States v. Hartmann,* 958 F.2d 774, 790 (7th Cir.1992) (citing *United States v. Jackson,* 780 F.2d 1305, 1308 (7th Cir. 1986)). In this case, even if the defendants did show that the evidence is favorable to them and that the evidence is material, they have not shown that the government "suppressed" the evidence within the meaning of *Brady.*

█ Evidence cannot be regarded as "suppressed" by the government when the defendant has access to the evidence before trial by the exercise of reasonable diligence. "[R]egardless of whether the evidence was material or even exculpatory, when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." *United States v. Brown,* 628 F.2d 471, 473 (5th Cir.1980). Daniel and Judith had access to the bankruptcy file from which Center extracted and photocopied the notes he turned over to the government. At trial, Daniel and Judith even introduced the originals of two of the very documents they accuse the government of "suppressing" in violation of *Brady.* The other two allegedly suppressed documents came from the same bankruptcy files. "While the Supreme Court in *Brady* held that the [g]overnment may not properly conceal exculpatory evidence from a defen-

dant, it does not place any burden upon the [g]overnment to conduct a defendant's investigation or assist in the presentation of the defense's case." *United States v. Marrero,* 904 F.2d 251, 261 (5th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 561, 112 L.Ed.2d 567 (1990); *accord United States v. Pandozzi,* 878 F.2d 1526, 1529 (1st Cir.1989); *United States v. Meros,* 866 F.2d 1304, 1309 (11th Cir.1989), *cert. denied,* 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). When defendants miss the exculpatory nature of documents in their possession or to which they have access, they cannot miraculously resuscitate their defense after conviction by invoking *Brady.*

Daniel and Judith raise yet another *Brady* claim. They allege that when testifying at trial, Center stated that he could not recall whether Grand Jury Exhibit 22 consisted of notes taken at the first meeting of creditors. Daniel and Judith juxtapose this statement with Bennett's notes from his meeting with Center which include the following entry: "ND hw. re 1st mtg of creditors—q's which were asked—tells what matters were 'testified about.'" The defendants argue that when Center testified that he did not know what the notes reflected, he was subject to impeachment with his prior statements and admissions to the government. Daniel and Judith indignantly contend that "[t]he governments' [sic] shameless silence in light of their duty to protect the truth violated the Whites' right to due process of law as guaranteed by the fifth amendment to the Constitution of the United States of America." (Defendants' Brief at 38).

We agree with the district court that Daniel and Judith have inflated the significance of Bennett's notes and detected an inconsistency where none exists. Exhibit 22 was labeled "1st Meeting Continued." There was never any question that it consisted of Dison's notes from the first meeting of creditors. The district court found that Center did not deny that Exhibit 22 was what it purported to be but rather testified only that he had no independent recollection of the contents of Exhibit 22. Bennett testified at the evidentiary hearing

on remand that he did not recall if Center told him that Center had personal recollection of the events at the first meeting. As the district court concluded, by identifying Exhibit 22 as Nancy Dison's notes from the first meeting of creditors and later stating that he had no independent recollection of the first meeting, Center did not make inconsistent statements. Accordingly, the government had no exculpatory evidence to turn over to Daniel and Judith under *Brady*.

### III.   Conclusion

For the reasons stated above, we AFFIRM.