**SMITHKLINE BEECHAM CORPORATION and Beecham Group, Plaintiffs,**

v.

**APOTEX CORPORATION, Apotex Inc., and TorPharm, Inc., Defendants.**

No. 98 C 3952.

United States District Court,
N.D. Illinois,
Eastern Division.

May 26, 2000.

Richard J. O'Brien, Sidley & Austin, Chicago, IL, Kenneth Frankel, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., for plaintiffs.

William A. Rakoczy, Lord, Bissell & Brook, Chicago, IL, for defendants.

## MEMORANDUM ORDER

BOBRICK, United States Magistrate Judge.

Before the court is the motion of defendants Apotex Corporation, Apotex Inc., and Torpharm, Inc. to compel the production of certain documents listed in the privilege log of plaintiffs Smithkline Beecham Corporation and Beecham Group, Inc.

## I. BACKGROUND

This case concerns the anti-depressant pharmaceutical that plaintiffs market as "Paxil." Beecham obtained United States Patent No. 4,721,723 on the drug Crystalline Paroxetine Hydrochloride Hemihydrate on January 26, 1988 ("723 Patent"), and eventually assigned it to Smithkline.[1] Defendant Apotex, a Canadian corporation manufacturing and marketing pharmaceuticals, established TorPharm as an operating division in 1993. TorPharm, also a Canadian corporation, was established to develop, test, and manufacture drugs in conformance with the requirements of the United States Food and Drug Administration ("FDA").

On May 18, 1998, plaintiffs received a letter from TorPharm notifying them that TorPharm had filed an Abbreviated New Drug Application with the FDA for "Paroxetine HCI Tablets." The letter informed plaintiffs that TorPharm believed its product did not infringe on the 723 Patent because it contained paroxetine in an anhydrous state,[2] as opposed to a hemihydrous state. Plaintiffs dispute this claim, contending that paroxetine hydrochloride in an anhydrous state will convert to a hemihydrous state.[3]

On June 26, 1998, plaintiffs filed a one-count patent infringement claim against defendants. Plaintiffs seek an order barring FDA approval of the defendants' product until the expiration of the 723 Patent. They also seek an order barring defendants from manufacturing, using, or selling their product until that time as well. Defendants have answered, and asserted the affirmative defenses of unenforceability and invalidity of the 723 Patent.

Presently before the court, however, is a dispute concerning the discoverability of some 1500 documents. Defendants sought production of documents relating to the conception, reduction to practice, development and testing of the invention. Plaintiffs claim the materials presently at issue are protected by the attorney-client privilege or the work product doctrine. To support their claims of immunity from discovery, the plaintiffs first described the documents at issue in a 370-page privilege log. After a brief review of that submission, it was clear to the court that plaintiffs' descriptions were insufficient to allow a ruling as to whether the documents were discoverable. Pursuant to court order, plaintiffs submitted a 386-page privilege log, in addition to discovering that nearly 100 documents which they originally considered privileged actually were discoverable. Then, with briefing on this matter nearly complete, defendants sought production on an additional 200 or so documents—this in a single sentence in an "additional reply memorandum." Plaintiffs were then obliged to file *yet another* privilege log, this one covering the newly sought documents in 89 pages. It may well be that all the documents at issue are presently properly categorized and before the court, but these two sides have proceeded

---

1. In 1990, Smithkline companies and Beecham companies merged to form Smithkline Beecham.

2. Being devoid of or without water.

3. Having two molecules of a compound for each molecule of water.

in such a haphazard manner that it is anyone's guess.

The current versions of the privilege logs present several issues, the same ones that the parties have been quarreling over for some time. The first, and most basic, is the adequacy of plaintiffs' descriptions of documents in the privilege log itself. Plaintiffs' original log was inadequate, failing in many instances to identify recipients and authors, or even nations of origin. In a case such as this, it is important to remember not only that the privilege is a hindrance, albeit a tolerated one, to the disposition of justice, but that it is the party asserting the privilege who bears the burden of establishing its applicability. More often than not, parties proceed in such a manner that would suggest they believe their opponent must undermine their unsupported claims of privilege or that it is the court's task to protect their communications for them. Neither, of course, is the case. Accordingly, this court directed the plaintiff to file a privilege log that complied with Fed.R.Civ.P. 26(b)(5), and cases such as *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 145 F.R.D. 84 (N.D.Ill.1992); and *In re General Instrument Corp. Securities Litigation*, 190 F.R.D. 527 (N.D.Ill.2000). That means the description of each document and its contents must be sufficiently detailed to allow the court to determine whether the elements of attorney-client privilege—or in other cases, work product doctrine—have been established. Failing this, the documents must be produced.[4] We now address the attorney-client privilege and work product doctrine, as well as the more specific issues raised in this matter, and evaluate the descriptions in plaintiffs' privilege logs.

## II. *ATTORNEY–CLIENT PRIVILEGE*

The party seeking to withhold materials from discovery bears the burden of establishing the essential elements to demonstrate the materials are privileged. *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir.1997). The elements have been summarized as follows:

(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected from disclosure by himself or by the legal adviser, (8) except the protection may be waived. *Id.* (*quoting* 8 John Henry Wigmore, Evidence in Trials at Common Law § 2292 (John T. McNaughton rev.1961)). Furthermore, the privilege must be established on a document-by-document basis; a blanket claim failing to specify what information is protected will not suffice. *United States v. White*, 970 F.2d 328, 334 (7th Cir.1992).

It is important to remember that, because the privilege impairs the court's search for the truth, it is narrowly construed. *Evans*, 113 F.3d at 1461. Not all information transmitted to an attorney becomes cloaked with the privilege. *White*, 970 F.2d at 334. For example, when information is transmitted to an attorney with the intent that it be transmitted to a third party, the material is not privileged. *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir.1983). In the end, however, the question is: does the document in question reveal, directly or indirectly, the substance of a confidential attorney-client communication. *Ohio–Sealy Mattress Mfg. Co. v. Kaplan*, 90 F.R.D. 21, 28 (N.D.Ill. 1980).

This dispute presents some significant issues beyond the ordinary context of attorney-client privilege. One is whether the court should recognize the United Kingdom's law of privilege for communications with patent agents. This touches on a large portion of the documents in dispute. Another involves the parties' disagreement over the application of the "common interest doctrine" to communications between plaintiffs and third parties such as Ferrosan A/S and Norvo Nordisk. Third, there is an issue as to whether technical information from scientists can qualify as privileged or protected under the work product doctrine. We will discuss each of these questions in turn as we deter-

---

4. This might appear a burdensome task in a case involving approximately 1500 documents, but it would be far more burdensome for one who is neither familiar with any of the documents nor has any vested interest in seeing to it that they are protected from discovery.

mine the status of the documents listed in the privilege logs. Given the disjointed manner in which the parties have presented their dispute, in order to achieve some level of consistency, we will enumerate those instances where we find plaintiffs have failed to meet their burden of establishing the applicability of the attorney-client privilege.[5]

## A. *Foreign Patent Agents*

▇ The vast majority of the documents at issue in this matter involve communications with foreign patent agents. Before evaluating plaintiffs' claims of privilege based on the descriptions in the logs, we must address the question of whether plaintiffs' communications with United Kingdom patent agents are privileged. This appears to be a rather unsettled area of law, with district courts—there has been little on the subject from appellate courts—taking several approaches to arrive at an answer. In this district, as a matter of comity, and as a functional approach to the problem, the trend is for courts to look to the foreign nation's law to determine the extent to which the privilege may attach. *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951 (N.D.Ill. 1982); *Baxter Travenol Laboratories, Inc. v. Abbott Laboratories*, No. 84 C 5103 (N.D.Ill. June 19, 1987) 1987 WL 12919; *Advertising to Women, Inc. v. Gianni Versace, S.p.A.*, No. 98 C 1553 (N.D.Ill. Aug. 4, 1999) 1999 WL 608711; *McCook Metals L.L.C. v. Alcoa Inc.*, 192 F.R.D. 242 (N.D.Ill.2000).[6] The courts have examined, first, whether the foreign nation in question extends the privilege to its patent agents. *McCook Metals*, 192 F.R.D. at 256; *Gianni Versace*, 1999 WL 608711, *2; *Baxter Travenol*, 1987 WL 12919, *8. Then, if such a privilege exists, the courts have moved on to assess the specific capacity in which the agent was functioning with respect to a given document. *McCook Metals, id., Gianni Versace*, 1999 WL 608711, *4; *Baxter Travenol, id.* This approach in determining application of the privilege leads to a more fair and workable solution than other existing approaches. See Daiske Yoshida, *The Applicability of Attorney–Client Privilege to Communications with Foreign Legal Professionals*, 66 Fordham L.Rev. 209, 242, 243 (1997). In essence, then, we will recognize the application of the privilege if the foreign nation extends the privilege to communications with patent agents and, with respect to those communications, the agents are more or less functioning as attorneys.

▇ The burden is on the party asserting the privilege to provide the court with the applicable foreign law, and demonstrate that the privilege applies to the documents it seeks to exclude from discovery. *McCook Metals*, 192 F.R.D. at 256; *Gianni Versace*, 1999 WL 608711, *3. Here, the majority of documents at issue relate to activities in the United Kingdom, and plaintiffs have provided the pertinent statute regarding patent agents. Communications with patent agents have been deemed to be privileged under British law since 1968. At that time, the Civil Evidence Act extended the privilege to communications with patent agents. *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 145 F.R.D. 298, 306 (E.D.N.Y.1992) *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 377,

---

5. In our discussion of the documents, we rely on the claims asserted and descriptions in the privilege log as opposed to those in the affidavits filed to support the claims—especially in the instances where there is conflict. Such conflicts and misdescriptions are not unexpected given the volume of documents. For example, a brief, random comparison between the log and the affidavit of Brian Russell reveals inconsistencies in document descriptions and claims asserted with regard to the following documents: 32, 40, 42, 51, 127, 225, 226, 228, 232, 234, 238, 240, 247, 251, 258, 286, 309, 373, 616, 648, 863, 989, 997, 1130, 1134. in addition, the nearly constant flux in which documents the defendants seek and which documents the plaintiffs claim are privilege make it nearly impossible to determine with

any certainty which documents the parties are quarreling over.

6. Other courts have focused on whether the patent agents communications "touch base" with the United States, looking to the foreign law of privilege only where those communication relate solely to activities outside this country. *Odone v. Croda Intern. PLC*, 950 F.Supp. 10, 12–13 (D.D.C. 1997); *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 377, 391 (D.D.C.1978); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1169–70 (D.S.C.1974). Still others employ the Second Restatement of Conflict of Laws as a guide. *Bayer AG v. Barr Laboratories Inc.*, 33 U.S.P.Q.2d 1655 (S.D.N.Y.1994); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 520 (S.D.N.Y.1992).

392 (D.D.C.1978) (*citing* Civil Evidence Act of 1968, § 15(1), 12 Hastings Statutes of England 927–28 (3d ed.1968)). Patent agents must be registered on an official list of qualified practitioners, and must first spend several years in training and pass two sets of examinations. Daiske Yoshida, *The Applicability of Attorney–Client Privilege to Communications with Foreign Legal Professionals,* 66 Fordham L.Rev. 209, 224 (1997). Once admitted, the agents must adhere to the rules of professional conduct proscribed by the Chartered Institute of Patent Agents. *Id.*

■ Having determined that, under United Kingdom law, communications with patent agents are privileged, we consider the second part of our equation: the capacity in which the patent agent was functioning. This involves many of the same considerations that would be relevant to determining whether a communication with a local attorney would be privileged. Thus, if the foreign agent "is engaged in the substantive lawyering process and communicates with his client, the communication is privileged to the same extent as a communication between an American attorney and his client." *Gianni Versace,* 1999 WL 608711, *4; *Mendenhall,* 531 F.Supp. at 954; *McCook Metals,* 192 F.R.D. at 256. If the agent is transmitting non-confidential information to the client, the communication is not privileged. *Gianni Versace,* 1999 WL 608711, *4; *Mendenhall,* 531 F.Supp. at 953, *McCook Metals,* 192 F.R.D. at 256. The focus, then, remains on the nature of the information revealed in the document. Generally, then we apply the same general notions underlying the attorney-client privilege in this country to the United Kingdom documents at issue here.

■ There are certain exceptions to the applicability of the attorney-client privilege in the context of foreign communications, however, that become apparent from examination of the plaintiffs' privilege log. First, there are approximately 100 documents in the privilege log that do not refer to activities in the United Kingdom but in fact refer to activities in over 20 other foreign countries, including: Argentina, Australia, Austria, Canada, Chile, China, Czech Republic, Den-

mark, Finland, France, India, Ireland, Jamaica, Japan, Malaysia, Netherlands, New Zealand, Norway, Pakistan, Philippines, and South Africa. Under *Gianni Versace* —cited by plaintiff—it is the plaintiffs' burden to provide background information on the privilege in patent practice in these nations. 1999 WL 608711, *3; *McCook Metals,* 192 F.R.D. at 256–57. Here, however, plaintiffs claim that this is unnecessary as the documents are described as involving a UK attorney or patent agent providing information to a foreign patent agent or attorney "acting as a functionary for [a foreign] patent application." Under *Mendenhall,* according to plaintiffs, it makes no difference if the foreign—as opposed to UK—agent or attorney enjoys a privilege for such communications in his or her own nation, because the foreign agent is merely acting as a functionary for the UK agent or attorney. 531 F.Supp. at 954. This is true—to a certain extent. The *Mendenhall* court also stated that:

the privilege should not extend to the situation in which the foreign patent agent occupies the conduit role—where he is employed only because the foreign country somehow makes his services necessary to the United States lawyer. In that case the lawyer's use of an intermediary to transmit information to the foreign patent office should likewise not alter the outcome. So if direct communications between a United States lawyer and a foreign patent office are publicly available and are not privileged on any basis, the same result should obtain if the transmittal goes via the patent agent.

531 F.Supp. at 953. Certain of these "third-country" communications would appear to involve confidential legal advice flowing either to or from the plaintiffs' United Kingdom representation. Judging by plaintiffs' description in the privilege log, however, it would appear that many other documents are merely transmittals of non-confidential information from the UK agent, through the foreign agent, intended for a foreign patent office. These communications appear to involve foreign patent applications based on United Kingdom patents—both of which, without more from plaintiffs, we must as-

sume are a matter of public record. *Illinois Tool Works, Inc. v. KL Spring & Stamping Corp.,* 207 U.S.P.Q. 806, 808 (N.D.Ill.1980). Accordingly, we must find that plaintiffs have failed to meet their burden of establishing the privilege with respect to the following documents: 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 120, 121, 162, 165, 173, 189, 194, 196, 200, 204, 211, 213, 217, 235, 236, 241, 248, 255, 261, 268, 269, 273, 281, 282, 291, 296, 297, 316, 317, 318, 322, 332, 367, 399, 402, 448, 795, 796.

### B. *Patent Practice and Privilege*

Having determined that the fact that a document represents a communication with a foreign patent agent is not in and of itself a bar to asserting the privilege, we assess the plaintiffs' claims of privilege based on their document descriptions. The greatest number of documents for which plaintiffs claim the attorney-client privilege are described as pertaining to legal strategies for protecting inventions, securing patents, or defending patents once obtained. Courts have struggled with the application of the attorney-client privilege to the practice of patent law. It was not until 1963, that the Supreme Court establish that patent practice—advising clients as to patentability, drafting specifications and claims, preparation of arguments to establish patentability, etc.—was the practice of law. *Sperry v. Florida,* 373 U.S. 379, 383, 83 S.Ct. 1322, 1325, 10 L.Ed.2d 428 (1963). Since that time courts have either considered patent attorneys to be conduits of information between a client and the Patent Office, where the lack of expectation of confidentiality doomed the application of the privilege, *see, e.g. Jack Winter, Inc. v. Koratron Co.,* 50 F.R.D. 225, 228 (N.D.Cal. 1970), or have rejected the conduit theory, and held that nearly all communications between client and patent attorney are requests for legal advice in that they pertain to assessment of patentability, and preparation and prosecution of the patent application. *Knogo Corp. v. U.S.,* 213 U.S.P.Q. 936, 939–941 (1980). Courts have also attempted to draw a line between technical and legal information which, in the context of patent law, is not a line easily drawn. *See, e.g. In re Spalding Sports Worldwide,* 203 F.3d 800,

806 n. 3 (Fed.Cir.2000) (collected cases). Whatever line of analysis a court takes, however, the focus must always remain on whether confidential legal advice is revealed in a document.

The fact that such advice may bear on technical issues or require technical information does not necessarily render it any less confidential than legal advice pertinent to a financial dispute, a tort case, or a criminal matter. For example, many of the documents are described as concerning legal advice regarding patent protection in the context of a decision of whether to enter into a licensing agreement, or obligations under existing agreements. In these cases, the patent agent is performing the same type of substantive legal function as would an attorney under similar circumstances in any other business setting. These documents appear to reveal legal advice bearing on negotiation strategies, or permissible courses of action under existing agreements which, although premised on technical information, are of a confidential nature.

A large portion of the documents in this category appear to reveal communications involved in the strategizing process proceeding patent application. These types of materials reflect communications between an attorney and client as the attorney attempts to shape the application for presentation to the patent office. While the application and communications with the patent office may themselves be a matter of public record and not privileged, the same cannot be said for the honing of technical specifications, claims, and decisions regarding inclusion or exclusion of information that occurs before the application itself. *See, e.g. McCook Metals,* 192 F.R.D. at 253; *Amsted Indus., Inc. v. National Castings, Inc.,* 1990 WL 103286, *4 (N.D.Ill.1990). Accordingly, we find materials of this nature to be privileged.

■ Further along the sliding scale of legal and technical information are those documents which are described as involving reports of technical information or results of tests requested by attorneys. These exchanges are said to involve assessments of patentability, or provide information underly-

ing legal advice for the protection of patents. In *Spalding,* the Federal Circuit discussed the application of the privilege to materials that were substantially technical, but produced in a legal setting:

> we do not consider that it is necessary to separately evaluate each of its components. It is enough that the overall tenor of the document indicates that it is a request for legal advice or services. Moreover, it is not necessary to expressly request confidential legal assistance when that request is implied. . . . the inclusion of [technical] information does not render the document discoverable, because requests for legal advice on patentability or for legal services in preparing a patent application necessarily require the evaluation of technical information such as prior art.

\* \* \*

> In any event, an attorney cannot evaluate patentability or prepare a competent patent application without knowing the prior art and obtaining the relevant technical information from the inventors.

203 F.3d at 806; *see also McCook Metals,* 192 F.R.D. at 254 (following Federal Circuit law with respect to materials unique to patent law). Accordingly, we find such documents, described as prepared in order to allow attorneys to assess patentability and sift information to prepare applications, to be immune from discovery under the attorney-client privilege.[7]

■■■ Next, we note that several documents are described as agendas for meetings, many of which are authored by attorneys. Such a description makes it very unlikely that legal advice is implicated, nor would such documents ordinarily be expected to reveal confidential communications. These documents must be produced: 140, 354, 587, 648, 667, 692, 718, 753, 760, 785, 798, 825, 841, 842, 844, 858, 920, 973, 1209, 1213, 1220, 1225, 1232, 1234, 1238, 1239, 1243, 1247, 1249, 1252, 1379. On the other hand, documents described as minutes of meetings with counsel present to provide legal advice would be likely to contain confidential communications, and as such are not available to discovery. *Wilstein v. San Tropai Condominium Master Assoc.,* 189 F.R.D. 371, 379 (N.D.Ill.1999).

■■■ Certain other documents, although described as requesting legal advice, are communications between two or more non-legal advisors, a copy of which may or may not have been forwarded to a United Kingdom patent agent. We cannot find such communications meet the requirements for establishing the privilege because they would not be privileged under similar circumstances in this country. *In re General Instrument Corp. Securities Litigation,* 190 F.R.D. 527, 530 (N.D.Ill.2000); *In re Air Crash Disaster at Sioux City,* 133 F.R.D. 515, 519 (N.D.Ill. 1990). These include Documents 16, 28, 42, 43, 52, 57, 76, 86, 127, 140, 219, 239, 299, 639, 865, 878, 886, 887, 909, 965, 995, 1048, 1054, 1060, 1063, 1066, 1132, 1185, 1191, 1198, 1229, 1361, 1362, 1363. Similarly, Documents 5, 22, 23, 45, 47, 48, 50, 69, 80, 156, 160, 191, 323, 389, 395, 865, 873, 888, 895, 921, 928, 930, 962, 1010, 1073, 1074, 1161, 1272, 1348, 1392, 1465 are described as being distributed throughout the entirety of Beecham or Smithkline Beecham UK management, or throughout the entirety of other departments. Where the client is a corporation, the privilege is waived if the communications are disclosed to employees who did not need access to the communication. *Baxter Travenol,* 1987 WL 12919, \*5. General, group-wide descriptions such as "management" do not allow for the court to assess whether the recipients require, or have the capacity to act upon, the information distributed.[8] In addition, this appears to be too broad a distribution to seriously allow a claim of confidential-

---

7. *Those technical documents that are not described as involving requests for legal advice or designed to provide the basis for legal advice, but are instead characterized as testing in anticipation of litigation are addressed in the section on plaintiffs' work product claims.*

8. While the "control group" test for the attorney-client privilege in a corporate setting has been discredited, *Upjohn Co. v. United States,* 449 U.S. 383, 392, 101 S.Ct. 677, 684, 66 L.Ed.2d 584 (1981), the scope of an individual's employment is nevertheless highly relevant to the question of maintenance of confidentiality. 449 U.S. at 403, 101 S.Ct. at 689 (Burger, C.J., concurring).

ity. *General Securities,* 190 F.R.D. at 531. Similarly, those documents for which plaintiffs fail to identify an author or recipient, or both, must also be produced: 354, 515, 865, 917, 941. These same problems come into play in the context of plaintiffs' claims of "common interest."

### C. *Common Interest*

■ On the subject of document distribution and maintaining confidentiality, we note that plaintiffs assert the "common interest doctrine" immunizes over 40 of the documents at issue from discovery, which were distributed outside of the corporation and its attorneys. These documents were created after plaintiff entered into an exclusive licensing agreement for the paroxetine with Ferrosan/AS, which was succeeded in interest by Norvo Nordisk ("licensor"). The common interest doctrine recognizes protection of communications among clients and attorneys "allied in a common legal cause." *In re Regents of University of California,* 101 F.3d 1386, 1389 (Fed.Cir.1996). Such a common interest "may arise between parties jointly developing patents; they have a common legal interest in developing the patents to obtain the greatest protection and in exploiting the patents." *Baxter Travenol,* 1987 WL 12919, *1. Here, the agreement between plaintiffs and the licensor was exclusive, which makes their interests essentially identical. *Regents,* 101 F.3d at 1390. The agreement gave the licensor primary responsibility for legal defense of the licensed patents, while plaintiffs were responsible for all reasonable assistance. Thus, we can conclude that there was a common legal interest between plaintiffs and Ferrosan/AS, and later between plaintiffs and Norvo Nordisk.

■ In most cases, it would appear that plaintiffs claim protection of the common interest doctrine as they would the attorney-client privilege or work product doctrine. The doctrine, however, is not a privilege in and of itself; it is merely an exception to the waiver of attorney-client privilege. Accordingly, only those documents that appear to reflect either confidential attorney-client communications or work product are immune from discovery.

■ In several instances, however, plaintiffs have failed to meet their burden of establishing the applicability of the attorney client privilege. A substantial portion of the "common interest" documents involve individuals, either as recipients or authors, that are described merely as "employees." As already noted, where the client is a corporation, the privilege is waived if the communications are disclosed to employees who did not need access to the communication. *Baxter Travenol,* 1987 WL 12919, *5. It is impossible to assess whether such generically described persons had any need for, or responsibility to act upon, such allegedly confidential information. Accordingly, the following documents must be produced: 25, 43, 216, 218, 224, 227, 229, 230, 465, 557, 559, 875, 877, 998, 1028, 1030, 1115, 1124, 1130, 1134, 1135, 1173, 1175, 1254, 1263, 1268, 1285, 1302.

### III. *WORK PRODUCT*

■ In the current versions of its privilege logs, plaintiffs claim that over 500 documents are immune from discovery under the work product doctrine. This figure is more than twice the number of documents for which plaintiffs made such a claim in the first log. As with the attorney-client privilege, the burden is on the discovery opponent to establish that the work product doctrine immunizes the documents at issue from discovery. *U.S. v. Hamilton,* 19 F.3d 350, 354 (7th Cir.1994) (evidentiary privileges in general); *Binks Mfg. Co. v. Nat. Presto Industries Inc.,* 709 F.2d 1109, 1119 (7th Cir.1983) (work product doctrine specifically). The work product doctrine is distinct from, and broader than, the attorney-client privilege. *In re Air Crash Disaster at Sioux City, Iowa,* 133 F.R.D. 515, 519 (N.D.Ill.1990) (*citing United States v. Nobles,* 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170 n. 11, 45 L.Ed.2d 141 (1975)). The work product doctrine developed to protect the work of an attorney from encroachment by opposing counsel. *Binks,* 709 F.2d at 1109. It consists of a multi-level protection whereby that information most closely related to an attorney's litigation strategy is absolutely immune from discovery, while that information with a

more tenuous relationship to litigation strategy might be available in circumstances evincing a substantial need or undue hardship on the part of the discovery proponent. Fed. R.Civ.P. 26(b)(3).[9] Accordingly, information that is merely factual may not be withheld under the umbrella of work product but must be available, if not through the production of otherwise protectible documents, then through interrogatories or depositions. 8 Wright & Miller, Federal Practice and Procedure, § 2023, at 194.

█ The threshold determination in a case involving a claim of work product privilege is whether the material sought to be protected from discovery was prepared in anticipation of litigation. *Binks,* 709 F.2d at 1118. The determination of whether materials are prepared in anticipation of litigation, however, while central to the work product doctrine, eludes precision. This is especially the case in certain contexts, where the discovery opponent routinely performs investigations and accumulates files even when no litigation ensues.

█ Ordinarily, we have found it helpful to express the elements of the work product doctrine into the concepts of "causation" and "reasonable anticipation" of litigation. *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.,* 145 F.R.D. 84, 87 (N.D.Ill.1992). There is a "causation" element insofar as production of the material must be caused by the anticipation of litigation. *Id.* If materials are produced in the ordinary and regular course of a discovery opponent's business, and not to prepare for litigation, they are outside the scope of the work product doctrine. Fed.R.Civ.P. 26(b)(3) (advisory committee notes). Accordingly, even if litigation is imminent, there is no work product immunity for documents prepared in the ordinary course of business rather than for litigation

purposes. *Binks,* 709 F.2d at 1118. That is to say, the mere fact that a discovery opponent anticipates litigation does not qualify an "in-house" document as work product. *Janicker,* 94 F.R.D. at 650.

█ As for "anticipation of litigation," courts have made clear that, because litigation can be anticipated at the time almost any incident occurs, a "substantial and significant threat of litigation" is required before a discovery opponent's anticipation will be considered a reasonable and justifiable motivation for production of a document. *Allendale,* 145 F.R.D. at 87. Demonstration of a substantial and significant threat requires a showing of objective facts establishing an identifiable resolve to litigate. *Id.* The fact that litigation ensues or that a party retains an attorney, initiates an investigation, or engages in negotiations over a claim, is not dispositive on the issue of whether litigation was anticipated. *Id. (citing Harper v. Auto-Owners Ins. Co.,* 138 F.R.D. 655, 660 (S.D.Ind.1991)) (collected cases).

█ We look to whether plaintiffs' descriptions of the documents are sufficient to allow for an evaluation of their assertion of work product immunity. That is, plaintiffs' descriptions must allow the court to assess whether the documents in question were prepared in anticipation of litigation given the elements discussed above. Here, however, plaintiffs offer almost nothing in the way of evidence to suggest a threat of litigation or a resolve to litigate. Plaintiffs claim, sporadically throughout their two privilege logs, that litigation was anticipated not only in the United States, but in Canada, Spain, Chile, Germany, and India. To support these broad-ranging claims, they essentially rely on a single statement in the affidavit of Brian Russell, UK Patent Agent and member of plaintiffs' intellectual property department:

9. Rule 26(b)(3) provides that:

   a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

that plaintiffs began anticipating litigation in 1992. (Russell Aff. ¶ 7). The only other mention of anticipated litigation is a footnote in one of plaintiffs' memoranda indicating that "plaintiffs are litigating, or have litigated, paroxetine patent lawsuits in Spain, Canada and the United States." (*Plaintiffs' Additional Supporting Memorandum,* at 10 n. 7). Obviously, these two exceedingly brief, conclusory, unsupported statements fall far short of establishing just when plaintiffs began creating work product in anticipation of litigation. They do not even cover all of the nations in which plaintiffs claim litigation was anticipated in the privilege logs. Furthermore, in his affidavit, Mr. Russell employs the phrase "possible future, or ongoing, paroxetine patent litigation." (Russell Aff. ¶¶ 7, 8, 28, 29). Such speculation falls far short of "objective facts establishing an identifiable resolve to litigate." For the most part, then, plaintiffs' claim of work product are wholly unsupported.

In addition, the vast majority of documents that are purportedly work product appear to involve product testing. According to plaintiffs, all of these documents qualify as work product under *Vardon Golf Co., Inc. v. BBMG Golf Ltd.,* 156 F.R.D. 641, 646 (N.D.Ill.1994). While that case dealt with product testing, the testing at issue began *after* litigation was initiated and thus, there was no issue regarding at which point litigation could have reasonably been anticipated. Such is not the case here, where plaintiffs make wide-ranging claims of anticipated litigation, covering four continents and spanning at least a decade, without any evidentiary support for their claims.

With regard to the instant case, plaintiffs became aware of defendants' competing product on May 18, 1998. That would be the earliest date plaintiffs could be said to have anticipated the instant litigation. The Canadian litigation to which plaintiffs refer in the footnote is also related to defendants' product. *SmithKline Beecham Corp. v. Apotex Corp.,* No. 98 C 3952 (N.D.Ill. May 13, 1999) 1999 WL 311697, *2. We are unable to determine from the plaintiffs' submissions or our own research when the purported litigation in Spain, Germany, Chile, or India com-

menced, let alone went it might have reasonably been anticipated. Accordingly, on this record, we are constrained to find that plaintiffs could not have anticipated litigation prior to May 18, 1998. All documents produced prior to that date, or for which plaintiffs have not identified a date, do not qualify as work product.

Therefore, we can find only the following documents to constitute work product immune from discovery: 822, 823, 824, 825, 831, 837, 838, 839, 841, 842, 843, 844, 852, 1204. All other materials for which plaintiffs claim work product immunity and to which no other privilege has been established or is claimed must be produced: 81, 90, 140, 146, 258, 267, 274, 286, 292, 293, 294, 295, 301, 305, 307, 310, 311, 312, 327, 328, 341, 347, 348, 349, 350, 351, 352, 354, 364, 380, 404, 417, 434, 443, 469, 470, 473, 474, 478, 489, 496, 506, 530, 531, 535, 538, 542, 544, 545, 552, 555, 556, 563, 556, 559, 562, 563, 568, 569, 573, 574, 576, 577, 579, 582, 585, 589, 591, 595, 597, 596, 601, 603, 604, 605, 608, 610, 611, 615, 616, 618, 619, 623, 624, 628, 633, 636, 640, 641, 646, 647, 648, 650, 652, 655, 659, 662, 665, 669, 670, 672, 673, 676, 680, 681, 682, 684, 685, 686, 687, 688, 689, 691, 694, 696, 697, 698, 702, 703, 704, 705, 708, 710, 711, 712, 713, 714, 715, 716, 718, 723, 725, 726, 727, 728, 729, 730, 731, 732, 733, 734, 735, 736, 737, 738, 739, 740, 741, 742, 744, 745, 748, 749, 751, 752, 754, 755, 756, 757, 758, 761, 762, 763, 764, 765, 767, 769, 770, 771, 772, 773, 774, 775, 776, 779, 781, 782, 783, 784, 789, 790, 794, 798, 799, 806, 809, 811, 812, 814, 818, 821, 840, 863, 866, 879, 880, 881, 882, 890, 891, 892, 899, 908, 910, 917, 918, 919, 922, 923, 925, 929, 936, 937, 939, 940, 945, 946, 947, 953, 955, 960, 973, 979, 985, 998, 1061, 1129, 1143, 1153, 1156, 1160, 1163, 1165, 1166, 1191, 1200, 1218, 1221, 1227, 1236, 1247, 1255, 1267, 1271, 1274, 1299, 1346, 1354, 1356, 1358, 1378, 1388, 1390, 1391, 1499, 1500.

## IV. *CONCLUSION*

For the foregoing reasons, defendants' motion to compel production of certain documents is GRANTED in part and DENIED in part, as set out in the body of this order. Plaintiffs are hereby ordered to produce those documents found not to be immune

from discovery within 15 days of receipt of this order.