James S. ALEXANDER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 28A01–0403–CR–141.

Court of Appeals of Indiana.

Dec. 23, 2004.

# 535

Katharine C. Liell, Russell C. Menyhart, Liell & McNeil Attorneys PC, Bloomington, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Stephen Tesmer, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Defendant James S. Alexander ("Alexander") appeals his conviction for the murder[1] of his wife, Mary Bland

1. Ind.Code § 35–42–1–1.

2. We heard oral argument in this case on December 7, 2004, at Vincennes University in

("Wife"). We reverse and remand for possible retrial.[2]

### Issues

Alexander raises four issues, which we consolidate and restate as:

I. Whether the trial court abused its discretion by excluding the testimony of an expert witness; and

II. Whether the trial court abused its discretion by instructing the jury.

### Facts and Procedural History

During the early morning hours of September 13, 2002, Alexander admitted to the police and his stepson that he shot and killed Wife. Alexander had spent most of the day prior to Wife's death drinking beer. At one point, he drove to the home of Bonnie Talley ("Talley"), his ex-wife, to visit his son. Wife followed Alexander to Talley's home, informed Talley that Alexander had been drinking, took Alexander's truck keys, and left Talley's home with Alexander's keys. Because Talley was afraid of Alexander when he was drinking, she asked him to leave her residence, which he did. Alexander, carrying a paper bag of beer, walked into the bean field across the street from Talley's house, where he remained for approximately two hours. When he returned from the field, Alexander retrieved a spare truck key from his wallet and drove away from Talley's residence at approximately 9:00 p.m. or 9:30 p.m.

Later that evening, at approximately midnight, Alexander went to Alan Vest's ("Vest") house and asked Vest if he "wanted to go drink some beer." Tr. at 529. Alexander and Vest then went to the Palace Bar to drink alcohol. At approximate-

Vincennes, Indiana. We thank counsel for their advocacy and extend our appreciation to Vincennes University for hosting the event.

ly 1:00 a.m., Wife arrived at the Palace Bar and Alexander met her in the parking lot. Wife and Alexander talked for "5 or 10 minutes" and then Alexander returned to the Palace Bar and continued drinking until the bar closed at approximately 3:00 a.m. According to Vest, Alexander seemed to be in "a pretty good mood." *Id.* at 536. When the two men left the bar, they drove to Vest's house, drank one beer, and Vest drove Alexander home.

Alexander's memory of the events surrounding Wife's death reportedly comes in "flashes." *Id.* at 836. While at home, Alexander remembers that he went into the house that he shared with Wife and retrieved a shotgun. Next, Alexander believes—and the physical evidence demonstrates[3]—that he took the shotgun and sat outside on the front porch, while drinking beer and contemplating suicide. At the time, Alexander apparently wanted to kill himself and "kill the demons." *Id.* at 837. At some point, Wife came outside and asked Alexander to come back inside the house. Subsequently, Alexander remembers talking with Wife in the living room and bedroom. The next memory or flash that Alexander has is of Wife "laying on her back" on the bed and "something told [him that] she was dead."[4] *Id.* at 837. Alexander, while still holding the shotgun, knocked on the bedroom door of his stepson, Shane Bland ("Bland"), informed Bland that he had shot Bland's mother, and asked Bland to call the police. Bland immediately dialed 9-1-1 and told the dispatcher that his mother was unconscious. Alexander also contacted the police and, twice, told the dispatcher that he was the killer. Thereafter, Alexander telephoned his mother and told her that he had killed Wife.

When police officers arrived at Alexander's home, they found him sitting in a chair with a shotgun in one hand and a telephone in the other. Linton Police Officer Gary Tannehill ("Officer Tannehill") retrieved the shotgun, which was a single shot shotgun, opened the chamber, and found that a "live round" was still in the shotgun." *Id.* at 315. Later it was determined that Wife died of a single gunshot wound to the head.

In September of 2002, the State charged Alexander with murder. On September 16, 2002, the trial court ordered Alexander to disclose the names and addresses of all persons whom he might call as witnesses on or before October 31, 2002. On January 3, 2003, Alexander, who suffers from depression for which he takes medication, filed his notice of mental disease or defect and a motion for leave to file a belated notice of insanity defense, which the trial court granted.

Pursuant to Alexander's insanity defense, the trial court appointed Susan Pauley, Ph.D ("Doctor Pauley"), Raymond Horn, Ph.D ("Doctor Horn"), and Dinesh B. Mehta, M.D. ("Doctor Mehta") to examine Alexander and testify as to his sanity at the time of the offense. On October 2, 2003, Doctor Pauley reported to the trial court that, after her interview with Alexander, she concluded that he was "highly intoxicated at the time of the offense" and that the incident was "not likely due to a severe mental illness such as Schizophrenia or Bipolar Disorder." Appellant's App. at 223. At trial, Doctor Pauley testified that Alexander was sane at the time of the

3. On September 13, 2002, police officers found beer cans "on the ground right next to the steps," which would not have been there earlier because Wife was a good housekeeper. Tr. at 836.

4. This memory flash, however, is inconsistent with the photographs taken by the police officers of Wife's death as they show that she was lying on her stomach when she was killed.

offense. Doctor Horn, likewise, examined Alexander and determined that there was no evidence of insanity. On October 7, 2003, Doctor Mehta reported to the trial court that, after interviewing Alexander, he found "no clinical evidence of insanity." Appellant's App. at 142.

That same day, Alexander filed his intent to call Doctor Philip M. Coons ("Doctor Coons") as a witness in support of the defense of insanity. In response to Alexander's belated disclosure of Doctor Coons, the State filed a motion in limine to exclude Doctor Coons's testimony. After conducting a hearing, the trial court granted the State's motion to exclude Doctor Coons as a witness because his testimony "would cause a substantial and irreparable prejudice to the [State.]" Appellant's App. at 203.

On October 21, 2003, the trial court conducted a jury trial. During closing arguments, the State contended as follows:

[I]f you think that you can find him guilty of Murder, but Mentally Ill and that means he will get special treatment at the Department of Correction[ ], he still gets convicted of Murder and punished, but his punishment will be somewhat, it would be that the Department of Correction[ ] will create a treatment plan those type of things for him if you find him guilty but Mentally Ill. And then you can apply that Mentally Ill tag to the next or to the lesser included as well, the same effect. And, then there are 2 there is a verdict of course of not guilty, he didn't do it, and then there is a one that he was Insane, he was insane and not . . . responsible at all and *that is essentially a not guilty verdict, he doesn't go to jail for that and he doesn't go to the Department of Correction[ ].*

Tr. at 975 (emphasis added). At the conclusion of trial, the trial court refused to give the jury the following instruction ("Instruction Nine"), which was proffered by Alexander:

[Instruction Number 9]
*Consequences of Not Guilty by Reason of Insanity Verdict*

A verdict of "not guilty by reason of insanity" does not mean that the accused will be released from custody. Instead, he will remain in confinement while the courts determine whether he has fully recovered his sanity. If he has not, he will be placed in a hospital for the mentally disordered [sic] or other facility, or in inpatient treatment, depending upon the seriousness or his present mental illness.

Moreover, he cannot be removed from that placement unless and until the court determines and finds the accused is no longer dangerous or gravely disabled, in accordance with the law of Indiana.

So that you will have no misunderstandings relating to a verdict of not guilty by reason of insanity, you have been informed as to the general scheme of our mental health laws relating to an accused, insane at the time of his crimes. What happens to the accused under these laws is not to be considered by you in determining whether the accused was sane or not at the time he committed his crime. Do not speculate as to if, or when, the accused will be found sane.

You are not to decide if the accused is currently sane or not sane. You are to decide only whether the accused was sane at the time he committed his crime. If upon consideration of all of the evidence, you believe the accused was insane at the time he committed his crime, and therefore that he is not responsible by reason of insanity, you must assume that those officials charged with the operation of our mental health system will

perform their duty in a correct and responsible manner, and that they will not release the accused unless he can be safely returned into society.

It is a violation of your duty as jurors if you find the accused sane at the time he committed his offense merely because of a doubt that the Department of Mental Health or the courts will probably carry out their responsibilities.

Appellant's App. at 302A (emphasis in original). In addition, over Alexander's objection, the trial court gave the following instruction ("State's Instruction Two"):

Intent, for the purposes of a murder conviction, may be inferred from the severity, duration, or brutality of the attack. The crime of murder is established by proof that [Alexander] knowingly or intentionally killed another human being. The intent to commit murder can be inferred from the use of a deadly weapon in a manner likely to cause death or serious injury.

Supp. Tr. at 11–12.

On October 24, 2003, the jury found Alexander guilty of murder. The trial court entered a judgment of conviction on the jury's verdict and sentenced Alexander to the Indiana Department of Correction for a period of sixty years. This appeal ensued.

### Discussion and Decision

#### I. *Exclusion of a Witness*

Alexander first argues that the trial court abused its discretion when it excluded Doctor Coons as a witness and, thus, denied him of the right to present the defense of insanity. The record reveals that, on October 7, 2003, i.e., two weeks prior to trial, the trial court conducted a hearing on the States motion in limine to exclude the testimony of Doctor Coons. At that hearing, Alexander maintained that, initially, he planned only to consult with Doctor Coons as an advisory expert, however those plans changed when he discovered that the three court-appointed experts were going to testify that Alexander was sane at the time of the offense in question. At the conclusion of the hearing, the trial court determined that permitting Doctor Coons to testify would cause "substantial and irreparable prejudice to the [State,]" because the State would not have sufficient time to secure a witness to counter Doctor Coons's testimony, nor would it be able to adequately cross-examine the doctor. Appellant's App. at 203. At trial, Alexander asked the trial court if the ruling in limine to exclude Doctor Coons's testimony was still in effect, to which the trial court responded in the affirmative. Alexander then made an offer of proof regarding the substance of Doctor Coons's testimony, concluding, in relevant part, that Alexander was legally insane at the time of Wife's death.

Trial courts have the discretion to exclude a belatedly disclosed witness when there is evidence of bad faith on the part of counsel or a showing of substantial prejudice to the State. *Williams v. State,* 714 N.E.2d 644, 651 (Ind.1999), *cert. denied,* 528 U.S. 1170, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000); *see also Wiseheart v. State,* 491 N.E.2d 985, 991 (Ind.1986) ("The most extreme sanction of witness exclusion should not be employed unless the defendant's breach has been purposeful or intentional or unless substantial or irreparable prejudice would result to the State."). In light of a defendant's right to compulsory process under the federal and state constitutions, there is a strong presumption to allow the testimony of even late-disclosed witnesses. *See Williams,* 714 N.E.2d at 651 (citing U.S. Const. amend. 6; Ind. Const. Art. I, § 13).

■ In the present case, there is no evidence of bad faith on the part of defense counsel.[5] Rather, this issue turns on whether the exclusion of Doctor Coons's testimony was compelled by a showing of substantial prejudice to the State. The State was informed of Doctor Coons's expected testimony two weeks prior to Alexander's trial. At that time, the State could have deposed Doctor Coons, found its own expert to rebut Doctor Coons's expected testimony, or, even, requested a continuance to investigate Doctor Coons's evaluation of Alexander. However, it failed to exercise any of these options. Instead, the State moved to exclude Doctor Coons's testimony from trial altogether, which the trial court granted.

In short, the trial court's ruling was based upon the State's need for additional time to investigate Doctor Coons and the details of his examination of Alexander and to secure its own witness to counter Doctor Coons's testimony regarding Alexander's insanity. Neither of these grounds rises to the level of substantial prejudice to the State under the facts of this case. The State was given two weeks to conduct an inquiry into Doctor Coons's testimony. If additional time were needed, a continuance would plainly have been appropriate. *See Cook v. State,* 675 N.E.2d 687, 691 (Ind. 1996) (observing that generally a continuance, rather than exclusion, is the appropriate remedy for the late disclosure of a witness). However, a continuance was not sought.[6] Under these circumstances, it appears that the trial court should have either allowed Doctor Coons to testify at the scheduled trial date or provided the State with a brief continuance to investigate the testimony of Doctor Coons. The "most extreme sanction," of witness exclusion, on these facts, constituted an abuse of discretion. *See, e.g., Williams,* 714 N.E.2d at 652.

■ Further, we will find an error in the exclusion of evidence harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights. *Fleener v. State,* 656 N.E.2d 1140, 1142 (Ind.1995). However, here, Doctor Coons was the sole witness prepared to testify that Alexander was legally insane at the time that he committed the offense. He was also the only expert witness with an opinion contrary to the three court-appointed experts on the issue of Alexander's sanity at the time of Wife's murder and, therefore, the only viable witness to support Alexander's insanity defense. As such, the erroneous exclusion of Doctor Coons as a witness was not harmless. Accordingly, the trial court committed reversible error when it excluded his testimony.

## II. Sufficiency of Evidence for Retrial

■ Having determined that the trial court committed reversible error by excluding Doctor Coons's testimony, the question of whether Alexander may be subjected to a new trial depends upon an analysis of the sufficiency of the evidence. *Berry v. State,* 725 N.E.2d 939, 944 (Ind. Ct.App.2000). When deciding whether re-

---

**5.** In its Appellee's Brief, the State asserts that Alexander's belated disclosure of Doctor Coons was motivated by bad faith. However, the State refers us to no actual evidence of bad faith and, indeed, the trial court found none.

**6.** The trial court acknowledged that the parties did not seek a continuance and, moreover, that a continuance would not have been appropriate because of the publicity surrounding the trial and the congestion of the court's calendar. However, neither of these reasons justifies the exclusion of a defense witness.

trial is permissible, we will consider all of the evidence admitted by the trial court, including any erroneously admitted evidence. *Id.* If, viewed as a whole, that evidence would have been sufficient to sustain the judgment, retrial would not offend double jeopardy principles. *Id.* If, however, the evidence is insufficient, Alexander may not be retried. *Id.*

When considering a challenge to the sufficiency of the evidence, we neither reweigh evidence nor judge witness credibility. *Id.* Considering only the evidence and reasonable inferences that support the verdict, we must decide whether there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Browning v. State*, 775 N.E.2d 1222, 1226 (Ind.Ct.App. 2002).

Here, the record reveals that Alexander admitted to Bland, the police, and his mother that he had shot and killed Wife. Indeed, at trial, Alexander never disputed that he was the one who killed Wife. Rather, Alexander merely asserted two defenses: (1) the affirmative defense of insanity; and (2) the defense of an accidental shooting. Further, with respect to Alexander's intent to kill Wife, the evidence demonstrates that Wife died of a single gunshot wound to the head. "[T]he use of a deadly weapon in a manner likely to cause death or serious bodily injury is sufficient evidence of intent to support a conviction for murder." *Chapman v. State*, 719 N.E.2d 1232, 1234 (Ind.1999) (citing *Torres v. State*, 673 N.E.2d 472, 473

(Ind.1996)), *reh'g denied.* Accordingly, this evidence was sufficient to support Alexander's conviction for murder and retrial would not offend double jeopardy principles. As such, this case is remanded for possible retrial.

### III. Instructing the Jury

Alexander further argues that the trial court abused its discretion by instructing the jury. Our resolution of the exclusion of a witness issue obviates the need to address the appropriateness of the trial court's jury instructions. However, because this issue may reappear, we will address it here.[7]

The giving of jury instructions is a matter within the sound discretion of the trial court, and we review the trial court's refusal to give a tendered instruction for an abuse of that discretion. *McCarthy v. State*, 751 N.E.2d 753, 755 (Ind.Ct.App.2001), *trans. denied.* However, an abuse of discretion does not occur if the instructions, considered as a whole and in reference to each other, do not mislead the jury as to the applicable law. *Young v. State*, 696 N.E.2d 386, 389–90 (Ind. 1998). In reviewing a trial court's decision to give or refuse tendered jury instructions, we consider: "(1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions

---

7. Alexander also contends that the trial court committed fundamental error by permitting a court-appointed psychologist to testify in the middle of the State's case-in-chief, in violation of Indiana Code Section 35-36-2-2. Because the propriety of the order of trial is unlikely to be an issue on retrial, we do not address this issue. However, should this issue recur, we alert the trial court that Indiana Code Section 35-36-2-2, which governs the admissibility of evidence, is explicit as to when court-appointed mental health professionals are to testify at trial: "This testimony *shall* follow the presentation of the evidence for the prosecution and for the defense, including testimony of any medical experts employed by the state or by the defense." *Id.* (emphasis added).

that are given." *Chambers v. State*, 734 N.E.2d 578, 580 (Ind.2000), *reh'g denied.*

In the present case, Alexander asserts that the trial court improperly instructed the jury regarding the intent element of murder by giving State's Instruction Two. Alexander also asserts that the trial court abused its discretion by refusing to give an instruction on the penal consequences of a "not guilty by reason of insanity" verdict, i.e., Instruction Nine, because the State misled the jury that such a verdict was tantamount to a finding of "not guilty." We separately address each of these arguments.

### A. Intent to Kill Instruction

■ Alexander first maintains that the trial court abused its discretion when it instructed the jury with State's Instruction Two, which provided, in relevant part, that: "Intent, for the purposes of a murder conviction, may be inferred from the severity, duration, or brutality of the attack." In particular, Alexander contends that such instruction "impermissibly drew the jury's attention to the brutality of the attack" and created "an improper emphasis on the brutality of the attack, thereby harming [his] alternative defense that the shooting was accidental." Appellant's Br. at 38.

In *Barany v. State*, 658 N.E.2d 60, 65 (Ind.1995), the defendant challenged a similar jury instruction on the intent to kill. There, the challenged instruction provided:

> The intent to kill can be found from acts, declarations, and conduct of the defendant at or just immediately before the commission of the offense, from the character of the weapon used, and from the part of the body on which the wound was inflicted.

*Id.* In holding that "this instruction is a correct statement of the law in Indiana[,]" our supreme court acknowledged that it has "repeatedly held that the intent to kill

may be inferred from the use of a deadly weapon; the nature, duration, or brutality of the attack; and the circumstances surrounding the crime." *Id.* (citing *Nunn v. State*, 601 N.E.2d 334, 339 (Ind.1992)).

More recently, in *Cohen v. State*, 714 N.E.2d 1168, 1177 (Ind.Ct.App.1999), *trans. denied*, another panel of this Court upheld the following "intent to kill" instruction:

> The intent to kill may be inferred from the use of a deadly weapon used in a manner reasonably calculated to cause death and from the nature, duration, or brutality of the attack. An intention to kill may also be found from acts, declarations, and conduct of the defendants at or just immediately before the commission of the offense, and from noting the part of the body on which the wound was inflicted.

*Id.* The *Cohen* court held that, because the jury instruction at issue was a correct statement of the law, the trial court did not err by giving such instruction. *See id.; see also Mitchell v. State*, 726 N.E.2d 1228 (Ind.2000) (holding that intent may be inferred from the severity, duration, or brutality of the attack), *reh'g denied, overruled on other grounds by Robinson v. State*, 805 N.E.2d 783 (Ind.2004). Likewise, here, the challenged instruction was a correct statement of the law and, thus, we find no abuse of discretion.

■ Moreover, we note that State's Instruction Two did not mislead the jury. In determining whether a particular jury instruction misled the jury, our charge is to consider the instructions as a whole and in reference to each other. *Luckhart v. State*, 780 N.E.2d 1165, 1168 (Ind.Ct.App. 2003). In the present case, in addition to the intent to kill instruction in dispute, the trial court also instructed the jury that:

In deciding this case, you must determine the facts from a consideration of all the evidence and look to these instructions from the court for the law of the case and find your verdict accordingly. All of the law of this case has not been embodied in any one instruction. Therefore, in construing any single instruction you should consider it with all other instructions given.

\*    \*    \*    \*    \*    \*

The law does not require a direct statement of intent by a defendant to prove the intent to commit a particular crime. The jury may infer from all the surrounding circumstances what the intent of [Alexander] was at the time an act was committed.

Supp. Tr. at 1, 11. These instructions, considered as a whole, adequately informed the jury regarding the intent element of murder.

## B. Instruction on Penal Consequences

Next, Alexander argues that the trial court erred by failing to instruct the jury on the penal consequences associated with a "not guilty by reason of insanity" verdict. We observe that, as a general proposition, it is not proper to instruct the jury on the specific penal ramifications of its verdicts. *Georgopulos v. State*, 735 N.E.2d 1138, 1141 (Ind.2000). However, our supreme court has adopted the following procedure for cases tried after September 29, 2000:

> When the verdict options before a jury include not responsible by reason of insanity or guilty but mentally ill, and the defendant requests a jury instruction on the penal consequences of these verdicts, the trial court is required to give an appropriate instruction or instructions as the case may be.

*Id.* at 1143. Prior to this pronouncement in *Georgopulos*, a defendant was only enti-

tled to an instruction on post-trial procedures if an erroneous view of the law on the subject had been planted in the jurors' minds. *Caldwell v. State*, 722 N.E.2d 814, 816–17 (Ind.2000); *see also Dipert v. State*, 259 Ind. 260, 262, 286 N.E.2d 405, 407 (1972).

In the present case, which occurred after September 29, 2000, and included a verdict option of "not responsible by reason of insanity," Alexander was entitled to an instruction regarding the penal consequences of the verdict options. Indeed, even assuming arguendo that Alexander's proffered Instruction Nine was an inaccurate statement of the law, he was still entitled to an appropriate instruction regarding the penal consequences of a "not responsible by reason of insanity" verdict. *See Georgopulos*, 735 N.E.2d at 1141. Accordingly, should this issue recur, the trial court must instruct the jury on the penal ramifications of its verdict, regardless of whether an erroneous view of the law has been planted in the jurors' minds.

For the foregoing reasons, we reverse Alexander's murder conviction and remand for possible retrial.

Reversed and remanded.

SHARPNACK, J., and MAY, J., concur.