Charles W. BOWLDS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 27A02–0408–PC–696.

Court of Appeals of Indiana.

July 28, 2005.

Publication Ordered Sept. 20, 2005.

---

Matthew Jon McGovern, Evansville, for Appellant.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, for Appellee.

## ORDER

This Court heretofore handed down its opinion in this appeal on July 28, 2005, marked Memorandum Decision, Not for Publication.

Comes now the Appellant, by counsel, and files herein Motion to Publish Memorandum Decision, alleging therein that counsel for the Appellant believes that if this case is published, it will be the only decision which holds that the State was required to disclose exculpatory evidence contained in a police report even in light of the State's assertion of its work product privilege. Counsel further alleges that if this Court's opinion in this case is published, it will provide guidance regarding the extent to which the State may use its work product privilege to deny defense counsel access to evidence in police reports. Counsel believes that the decision in this case would provide the only discussion of police reports as exculpatory evidence. The Appellant therefore requests this Court to publish its Memorandum Decision in this case.

The Court having examined said Motion, having reviewed its opinion in this appeal and being duly advised, now finds that the Appellant's Motion to Publish Memorandum Decision should be granted.

IT IS THEREFORE ORDERED that the Appellant's Motion to Publish Memorandum Decision is GRANTED, and this Court's opinion heretofore handed down in this cause on July 28, 2005, marked Memorandum Decision, Not for Publication, is now ordered published.

All Panel Judges Concur.

## OPINION

CRONE, Judge.

### Case Summary

Charles W. Bowlds appeals his conviction and sentence for class C felony criminal recklessness resulting in serious bodily injury, as well as the denial of his petition for post-conviction relief. We reverse and remand.

### Issue

Bowlds raises numerous issues, one of which is dispositive: whether the State improperly suppressed material exculpatory evidence.

### Facts and Procedural History

The facts most favorable to the conviction indicate that at approximately 8:30 p.m. on December 1, 2000, Jack Greer and Bowlds arrived at the home of Greer's friend Pamela Weaver in Marion, Indiana. Greer introduced Bowlds to Weaver as his cousin. Greer, Bowlds, Weaver, and her friend Irene Christopher went upstairs to smoke crack cocaine while Weaver's three children watched television in the living room downstairs. Kennedy Russell arrived shortly thereafter. At some point, Bowlds introduced himself to Russell as Randy Bowlds.[1] Weaver and Greer joined Russell downstairs in the kitchen. Weaver, a crack cocaine addict, paged a man known as "50" to obtain more of the drug, which Bowlds would purchase. Henry Hull and Jessie Flowers then entered Weaver's home. Greer drove Weaver to pick up "50" from a nearby street corner.

When the trio returned several minutes later, all the adults were in the kitchen. Greer and Bowlds talked with "50" on the back porch. An angry Bowlds then entered the kitchen with a handgun, yelling that he was looking for the pouch in which he kept his money. "50" left the premises.

Bowlds ordered all the adults into an upstairs bedroom and threatened to shoot someone if he did not get his money. Bowlds brandished his handgun and ordered everyone to strip. The handgun discharged into the floor. Downstairs, the bullet struck Weaver's eight-year-old son in the leg. Weaver called 9–1–1 at 9:48 p.m., and the remaining adults left the home.

Police arrested Bowlds on December 8, 2000, and his photo appeared in a local newspaper article the next day. That photo was used in a six-photo array from which Weaver, Hull, Russell, and Flowers identified Bowlds as the shooter. On December 11, 2000, the State charged Bowlds with class C felony criminal recklessness resulting in serious bodily injury. The trial court appointed C. Robert Rittman as Bowlds's public defender. Eight days later, Bowlds retained private counsel. On August 24, 2001, the trial court reappointed Rittman as Bowlds's public defender. On October 5, 2001, trial was set for November 13, 2001. On November 9, 2001, Rittman filed a motion for continuance stating that his relationship with Bowlds had deteriorated and that Bowlds had "lost confidence in [his] preparation and preparedness for trial" and "desire[d] to retain private counsel." Appellant's App. at 81. Also on that date, Bowlds filed a pro se motion for continuance to seek "adequate" counsel. *Id.* at 82. Sometime between November 9 and 12, 2001, Bowlds met with Scott Montgomery for the purpose of retaining him as private counsel.

At a pretrial hearing on November 13, 2001, the trial court denied a continuance, noting that the case was almost a year old; that Bowlds had been granted three continuances; and that it should have been notified of the deteriorating attorney-client

---

1. At trial, Bowlds's nephew identified Bowlds as his "uncle Randy." Tr. at 369.

relationship several weeks earlier. Bowlds invoked his constitutional right to self-representation. After informing Bowlds about the relevant pitfalls, the trial court allowed him to continue pro se and appointed Rittman as standby counsel. Bowlds conducted voir dire and then telephoned Montgomery to request his representation. Montgomery obtained Rittman's case file and served as Bowlds's counsel during the remainder of the trial. On November 15, 2001, the jury found Bowlds guilty as charged.[2] On January 4, 2002, the trial court sentenced Bowlds to eight years of imprisonment.

On January 18, 2002, Montgomery filed a notice of appeal on Bowlds's behalf. On June 5, 2002, this Court granted Bowlds's pro se motion for remand to allow him to file a petition for post-conviction relief pursuant to the procedure outlined in *Hatton v. State*, 626 N.E.2d 442 (Ind.1993). On June 17, 2003, Bowlds, by counsel, filed a petition for post-conviction relief. On May 20, 2004, the post-conviction court denied Bowlds's petition. On June 18, 2004, Bowlds, by counsel, filed a notice of appeal from the denial of his petition. On October 18, 2004, this Court granted Bowlds's motion to consolidate his direct appeal and his appeal from the denial of his petition for post-conviction relief.

### Discussion and Decision

◼ "Due process requires the State to disclose to the defendant favorable evidence which is material to either his guilt or punishment." *Stephenson v. State*, 742 N.E.2d 463, 491 (Ind.2001) (citing *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)), *cert. denied* (2002). To prevail on a claim that the prosecution failed to disclose such evidence, a defendant must establish: "(1) that the evidence at issue is favorable to the accused, because it is either exculpatory or impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the evidence was material to an issue at trial." *Prewitt v. State*, 819 N.E.2d 393, 401 (Ind.Ct.App. 2004), *trans. denied* (2005). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433, 115 S.Ct. 1555 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at 434, 115 S.Ct. 1555 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375).

◼ After the first day of trial, Bowlds's counsel stated that he had just been informed of "at least one police report in the State's possession that [he had] not been privy to" and requested the disclosure of "anything that's been created by the police department as part of [its] investigation." Tr. at 138. The prosecutor responded, and the trial court agreed, that the police re-

---

**2.** We note that two pages of the chronological case summary, including entries relating to the trial, are missing from Bowlds's appellant's appendix. *See* Appellant's App. at 3, 6 (pages 4 and 5 missing).

ports were nondiscoverable.[3] *Id.* at 138–39; *see Goudy v. State,* 689 N.E.2d 686, 695 (Ind.1997) ("Unless the privilege has been waived, investigative police reports are not discoverable and are considered protected as the work product of the prosecutor."). The next day, Bowlds requested that the court conduct an *in camera* review of the reports to determine "if there's anything exculpatory in there[.]" Tr. at 141; *see Goudy,* 689 N.E.2d at 695 ("If a trial judge has concerns about whether the prosecutor might be withholding exculpatory or discoverable information, we stress that *in camera* review is the proper method for resolving these concerns."). The trial court agreed to review the reports. The next day, the court stated that its "review did not indicate any exculpatory information that in some way or another might benefit [Bowlds's] case. In fact, most of what is contained in here is to the contrary." Tr. at 363. The court then ordered the documents sealed and made them part of the record.

■ On appeal, Bowlds seeks reversal of his conviction on the basis that the State improperly suppressed three police reports that he asserts contain favorable evidence material to the issue of his guilt. Sergeant Steven Scott's report indicates that on December 3, 2000, he spoke with William Hawkins regarding the shooting of Weaver's son. Appellant's App. at 278. Hawkins stated that he was at a seventh-and-eighth-grade basketball game when he "heard a subject by the name of Jeff Davis say that [h]e had heard Jack Greer was the one that shot the boy ... and he (Jack Greer) stated he didn't mean to do it." *Id.*[4] Sergeant Scott reported that "Hawkins does not know Jeff Davis or where he lives but he stated that Davis's son was one of the basketball players in one of the games." *Id.*

In the second report, Officer Jeffry Tomlinson described his response to a dispatch regarding the shooting of Weaver's son. He was informed that the suspects were in a red Pontiac Grand Am and that the shooter was "a black male wearing a black trench coat, black jeans, black shoes, and glasses." *Id.* at 293. Officer Tomlinson was advised that Greer was the driver of the Grand Am, and he drove to Greer's apartment complex. Officer McGuire[5] stopped the Grand Am, and Officer Tomlinson provided backup. According to Officer Tomlinson, "[t]he passenger, Jerome Flowers, stepped out of the vehicle wearing a black trench coat, glasses, blue jeans, and white tennis shoes. This subject matched the description close enough to be considered a suspect in the shooting with the available information." *Id.* Both Flowers and Greer were handcuffed and taken to the police department.

3. " 'Evidence cannot be regarded as "suppressed" by the government when the defendant has access to the evidence before trial by the exercise of reasonable diligence.' " *State v. Nikolaenko,* 687 N.E.2d 581, 583 (Ind.Ct. App.1997) (quoting *United States v. White,* 970 F.2d 328, 337 (7th Cir.1992)). "Thus, the State will not be found to have suppressed material information where that information was available to the defendant through the exercise of reasonable diligence." *Id.* Because the trial court determined that the reports were nondiscoverable, we need not determine whether Bowlds exercised reasonable diligence to obtain them.

4. Given the wording of Sergeant Scott's report, we must disagree with the State's assertion that "there is no indication that what Davis supposedly knew regarding the shooting was based on a statement by Greer to Davis or any other person[.]" Appellee's Br. at 10. We note that Sergeant Scott's report contains Hawkins's phone number, which might have facilitated further investigation of Davis's story.

5. Officer McGuire's first name does not appear in the record.

In his report, Officer McGuire also noted the similarities between Flowers's attire and the description of the shooting suspect. Officer McGuire transported Greer to the police department. En route, Greer stated, "I'm going to jail, I know I am[,]" and, "I didn't do anything, but I was in the same car." *Id.* at 301.

The State concedes that these reports "may have been theoretically favorable to Bowlds and [were] withheld by the State," but claims that they "cannot be characterized as material, in that there is no reasonable probability that the result of the proceeding would have been different had it been disclosed." Appellee's Br. at 10. Bowlds points out that the question is not whether the verdict would have been different with the evidence, but whether he received a fair trial without it. *See Prewitt*, 819 N.E.2d at 402. We conclude that he did not.

As was the case with the evidence suppressed in *Prewitt*, these reports raise "questions of the utmost importance ... about the manner, quality, and thoroughness of the investigation" and could have been used by Bowlds to "show shortcomings in the investigation." *Id.* at 407. The State's suppression of evidence tending to implicate Greer, who did not testify at trial, is particularly troubling in light of Weaver's testimony that she—an admitted crack cocaine addict—had sex with Greer in exchange for drugs and therefore had a motive to protect him despite the shooting of her son. *See* Tr. at 187–88 (Weaver stating that she was "more" than "just friends" with Greer "when [she] wanted to get high"). Bowlds also could have used the information in the reports to cast suspicion on Flowers, who was a passenger in Greer's vehicle on the night of the shooting and did not identify Bowlds as the gunman at trial.[6] More generally, Bowlds could have used the information in the reports to impeach the testimony of the other witnesses to the shooting, two of whom (Hull and Russell) were on probation during the trial and therefore had a strong incentive to testify in favor of the State. " 'When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight.' " *Prewitt*, 819 N.E.2d at 402 (quoting *Banks v. Dretke*, 540 U.S. 668, 675–76, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004)). The State did not do so in this case and thereby denied Bowlds a fair trial.[7] We therefore reverse his conviction for criminal recklessness.

---

6. When asked whether the "guy that had the gun" was in the courtroom, Flowers responded, "It's been about a year ago, you know, I mean I ain't for sure. Like I said it's been about a year ago. You don't want me to lie to you up here do you?" Tr. at 270.

7. During Bowlds's case in chief, defense counsel asked Bowlds's fiancée, who had lived with him since 1997, whether she was aware of his "position regarding firearms[.]" Tr. at 342. She responded that Bowlds has "been a single parent so he's very possessive of kids. You know, he's been around them all his life so there's no way he'd ever have a gun in his possession." *Id.* The prosecutor then argued that defense counsel had "opened the door" to Bowlds's history of gun possession and sought to question his fiancée about his arrest and purported conviction for "threatening a person with a gun" in Colorado in 1996. *Id.* at 343. Defense counsel responded that Bowlds "might have been arrested but he wasn't convicted of it." *Id.* at 344. This factual dispute was never resolved, and the prosecutor subsequently asked Bowlds's fiancée, "Would it surprise you to know that he was charged and convicted of threatening somebody with a gun?" *Id.* at 347. On appeal. Bowlds points out that he was in fact charged with menacing, a crime that may involve the use of a deadly weapon (in his case, a handgun), but pled guilty to harassment, a crime that does not involve the use of a deadly weapon. *See* Appellant's App. at 307, 305 (State's Exh. 18; Colorado charging

We must now determine whether sufficient evidence exists to retry Bowlds. *See Alexander v. State,* 819 N.E.2d 533, 539 (Ind.Ct.App.2004).

> When deciding whether retrial is permissible, we will consider all of the evidence admitted by the trial court, including any erroneously admitted evidence. If, viewed as a whole, that evidence would have been sufficient to sustain the judgment, retrial would not offend double jeopardy principles. If, however, the evidence is insufficient, [Bowlds] may not be retried.
>
> When considering a challenge to the sufficiency of the evidence, we neither reweigh evidence nor judge witness credibility. Considering only the evidence and reasonable inferences that support the verdict, we must decide whether there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt.

*Id.* at 539–40 (citations omitted). More specifically, we note that the testimony of a single eyewitness is sufficient to sustain a conviction. *Badelle v. State,* 754 N.E.2d 510, 543 (Ind.Ct.App.2001), *trans. denied.*

> [A]ny inconsistencies in identification testimony go only to the weight of that testimony, as it is the task of the jury to weigh the evidence and determine the credibility of the witnesses. This Court does not weigh the evidence or resolve questions of credibility when determining whether the identification evidence is sufficient to sustain a conviction.

*Id.* (citation omitted).

Here, three eyewitnesses—Weaver, Hull, and Russell—identified Bowlds as the shooter in a photo array and at trial. A fourth eyewitness—Flowers—picked out Bowlds from the same photo array. Bowlds points to inconsistencies in their testimony and otherwise impugns their credibility, but those matters are strictly within the province of the jury. *See Prewitt,* 819 N.E.2d at 416 ("Inconsistencies in the evidence are for the jury to evaluate, and to determine what evidence to believe."). We conclude that the evidence is sufficient to retry Bowlds.

As a final consideration, we note that Bowlds alleged in his petition for post-conviction relief that the photo array was unduly suggestive and that the witnesses' pretrial identifications tainted their in-court identifications.[8] Because this is-

---

information and minute entry of guilty plea); Colo.Rev.Stat. §§ 18–3–206 (defining menacing), 18–9–111 (defining harassment). Bowlds argues that the trial court abused its discretion by permitting the prosecutor to impeach his fiancée with "a conviction that did not exist" and that the prosecutor committed misconduct. Appellant's Amended Br. at 31–32. Because Bowlds did not offer a specific and timely objection to the prosecutor's question, request an admonishment, or move for mistrial, his arguments are waived for purposes of his direct appeal. *See Fennell v. State,* 698 N.E.2d 823, 825 (Ind.Ct.App.1998) (noting that failure to make specific and timely objection results in waiver of issue on appeal); *Brown v. State,* 799 N.E.2d 1064, 1066 (Ind. 2003) (noting that failure to request admonishment or move for mistrial results in waiver of prosecutorial misconduct claim). Although

we reverse Bowlds's conviction on other grounds, we observe that the prosecutor's mischaracterization of his prior conviction was patently prejudicial and possibly unethical. *See* Ind. Professional Conduct Rule 3.3(a) ("A lawyer shall not knowingly ... offer evidence that the lawyer knows to be false."); *see also* Ind. Professional Conduct Rule 3.8, cmt. ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.").

8. Specifically, Bowlds alleged that trial counsel was ineffective for failing to object to the pretrial and in-court identifications.

sue is likely to arise on retrial, we address it here.

> [T]he identification of a defendant must comport with the standards of due process. If an out-of-court identification procedure was unduly suggestive, then the testimony relating to it is inadmissible. In essence, this court must determine whether, under the totality of the circumstances, the identification process was conducted in such a manner that it created a substantial likelihood of irreparable misidentification. Our supreme court has held that a photo array is impermissibly suggestive only where the array is accompanied by verbal communications *or the photographs in the display include graphic characteristics that distinguish and emphasize the defendant's photograph in an unusually suggestive manner.*
>
> When analyzing the propriety of the pre-trial identification procedure here, the first issue we must address is whether the out-of-court procedure was conducted in a fashion that led the witness to make a mistaken identification. If it is unduly suggestive, we then address the second question, which is whether the witness had an independent basis for the in-court identification so as to make it admissible.

*Allen v. State*, 813 N.E.2d 349, 360 (Ind.Ct. App.2004) (citations omitted) (emphasis added), *trans. denied.*

Bowlds contends that the six-photo array was unduly suggestive because he is the only person wearing what he claims to be "a bright orange jumpsuit, the Grant County Jail's inmate uniform." Appellant's Amended Br. at 58. Bowlds argues that "the distinctive orange jumpsuit is designed to be easily recognized and identifiable as a jail uniform. Most important, jail markings are evident in the lower left corner of the photograph." *Id.* at 59. Bowlds further asserts that the photo array is "all the more suggestive [because] each of the four eye witnesses had experience with law enforcement and the penal system." *Id.* The State responds that "[a]lthough Bowlds is wearing an orange top, it is by no means clear that it is a jail uniform. Nor does the orange top unnecessarily stand out from the attire of the other subjects, who are clad in garments of various other colors." Appellee's Br. at 34.

We cannot agree with the State's characterization of Bowlds's attire. The only reasonable conclusion to be drawn from the photo is that Bowlds is clad in a standard-issue orange jail uniform, with which even the general public is undoubtedly familiar. The black markings on Bowlds's collar clearly serve an institutional, rather than a sartorial, purpose. In short, Bowlds's photo strongly suggests to a viewer of the array that he was the favored target of the investigation in this case. Also, Bowlds points out that the same photo appeared in the local newspaper before Hull, Flowers, and Russell viewed the array, and that Hull admitted to having seen the newspaper photo before he saw the array. Tr. at 231.[9] In light of these considerations, we conclude that the pretrial identification procedure was unduly suggestive and that the State may not introduce evidence thereof on retrial.

We must now determine whether the witnesses have an indepen-

---

9. In his deposition, Russell stated that he had seen Bowlds's photo in the newspaper. Tr. at 258. At trial, Russell claimed not to remember whether he had done so. When confronted with his deposition testimony, he replied, "If I saw it there, you know, I saw." *Id.* Flowers stated that he had "heard about" but "didn't see" the newspaper article regarding Bowlds's arrest. *Id.* at 277.

dent basis for an in-court identification on retrial.

The inquiry with reference to the in-court identification is whether, under the totality of the circumstances surrounding the witness's initial observation of the perpetrator at the scene of the crime, the witness could resist any suggestiveness inherent in the improper [pretrial] confrontation staged by the police and make an accurate decision, based on that earlier contact with the perpetrator, that the person presented to him at trial was the one who committed the crime. Factors relevant to the determination of whether an independent basis exists to support the admission of the in-court identification are the amount of time the witness was in the presence of the perpetrator and the amount of attention the witness had focused on him, the distance between the two and the lighting conditions at the time, the witness's capacity for observation and opportunity to perceive particular characteristics of the perpetrator, the lapse of time between the crime and the subsequent identification, the accuracy of any prior descriptions, the witness's level of certainty at the pre-trial identification and the length of time between the crime and the identification. *Wethington v. State*, 560 N.E.2d 496, 503 (Ind.1990) (citation omitted).

The record indicates that Weaver was in the shooter's presence for somewhat more than an hour, the other witnesses somewhat less. None of the witnesses had previously met the shooter, who introduced himself to Russell as Randy Bowlds. All were in the same room with Bowlds, but the lighting conditions are unknown. Hull stated that he looked "right at [Bowlds] in the face." *Id.* at 230. Weaver

admitted that she had smoked crack cocaine approximately a dozen times that day and "assume[d]" that everyone ran from the home because they were "scared" of "[b]eing in there and everybody's high, drugs." *Id.* at 190. Russell did not admit to ingesting alcohol or drugs but stated that "everybody [else] had, whatever type of buzz they had going on[.]" *Id.* at 249. Hull drank a six-pack of beer before he arrived at Weaver's home. Weaver identified Bowlds as the shooter "a few days" after the incident. *Id.* at 167. She described him to police as tall and slender, medium-complected, with a "cocked" or "lazy" eye, a goatee, and a black leather trench coat. *Id.* at 194. Approximately three months after the incident, Hull described the shooter as five feet eight or nine inches tall, dark-complected, clean-shaven, with "pushed down, flattened" hair. *Id.* at 229. Soon thereafter, Russell described the shooter as light-complected and clean-shaven. The record is silent as to the certainty of the pretrial identifications.

In view of the totality of these circumstances, we conclude that Weaver, Hull, and Russell do have an independent basis to identify Bowlds as the shooter on retrial. Bowlds introduced himself to Russell by his nickname. All three witnesses had an opportunity to observe and interact with Bowlds before he pulled a gun and forced them into an upstairs bedroom. The record indicates that they were under the influence of drugs or alcohol, but not to the point of being unable to remember the events leading up to the shooting. Weaver was the first to give a description of the shooter to the police; perhaps not surprisingly, her description most closely matches that of Bowlds's photo.[10] The accuracy of Russell's and Hull's descriptions might

---

**10.** We note that Bowlds's fiancée testified that she had never known him to have a "cocked" eye or a "flatten[ed]" hairstyle and that he has always worn facial hair. Tr. at 339–40.

well have been affected by the passage of time, and the inconsistencies in their testimony will be a matter for the jury to resolve. In summary, we reverse Bowlds's conviction for criminal recklessness and remand for further proceedings consistent with this opinion.

Reversed and remanded.

RILEY, J., and ROBB, J., concur.